625 A.2d 1005

**Linda Anne BEATTY, Personal Representative of the Estate of Christopher Lee Beatty, etc.**

v.

**TRAILMASTER PRODUCTS, INC. et al.**

No. 134, Sept. Term, 1992.

Court of Appeals of Maryland.

June 10, 1993.

728

C. Robert Loskot (Charles G. Bernstein, Bernstein, Sakellaris & Ward, all on brief), Baltimore, for appellants.

John J. Boyd, Jr. (Smith, Somerville & Case, Baltimore), Charles F. Obrecht, Jr. (Obrecht and Obrecht, Severna Park), all on brief, for appellees.

Argued before MURPHY, C.J., and ELDRIDGE, RODOWSKY, McAULIFFE, CHASANOW, KARWACKI and ROBERT M. BELL, JJ.

MURPHY, Chief Judge.

This case presents a challenge to the entry of a summary judgment in a tort action in favor of three corporate defendants who designed, manufactured, or sold an automobile "Lift Kit" device which had been installed on a motor vehicle subsequently involved in a serious two-car crash. Central to the proper disposition of the case is a provision of Maryland Code (1987 Repl.Vol.), § 22–105(c) of the Transportation Article, which specifies that a Class M (multipurpose) vehicle may not be operated on any highway in the State "with a bumper that exceeds a height of 28 inches."

I

On July 17, 1987, Christopher Lee Beatty's 1981 Honda Civic was involved in a highway collision with a 1982 Ford

Bronco operated by Allan Michael Smith. The suspension of the Bronco had been elevated by means of a F–1540 "Lift Kit" which raised its front bumper from the automobile manufacturer's design of 19 inches to approximately 24 inches above the ground. When the vehicles collided, Smith's Bronco rode up onto the hood of Beatty's Honda, crushing the front part of the Honda and pinning Beatty's legs in the driver's side footwell. Beatty sustained serious injuries in the accident; subsequently, he died.[1]

After Beatty's death, his wife, acting as personal representative of his estate, and on behalf of herself and two minor children (the plaintiffs), sued Smith; Alpa, Inc., an automobile parts distributor; and Trailmaster Products, Inc. and Hall Brothers of Michigan, Inc., alleged designers and manufacturers of the F–1540 Lift Kit. Wrongful death and survival actions were instituted against Smith, based on his alleged negligent driving.[2] The damage actions against the corporate defendants, in four counts, were for wrongful death and survival, based on strict products liability in designing, manufacturing, and selling a defective and unreasonably dangerous product, and with negligence in marketing a foreseeably unsafe product.

The complaint recited that sometime before November 24, 1982, Trailmaster and Hall designed, manufactured, and placed into commerce an F–1540 Lift Kit that either directly or through a distributor reached Alpa in Maryland. The complaint described a Lift Kit as "a set of parts and devices intended to alter the suspension of a motor vehicle by lifting or elevating the chassis and body of the motor vehicle higher above the ground than the motor vehicle was designed to ride by its manufacturer." The complaint averred that the Lift Kit was designed for use on motor vehicles when they are driven off-road, on rough, or irregular or

---

1. On September 27, 1990, Beatty was killed when his motorcycle struck a guardrail. Plaintiffs contend that it was Beatty's 1987 collision with Smith, which, in effect, caused his death.

2. Smith is not involved in this appeal.

uneven terrain. The complaint next recited that the Lift Kit "alters the suspension of the motor vehicle to such a height that the bumper, fenders, and vehicle body rest in a horizontal plane much higher than the bumper, fenders, and vehicle body of a truck or automobile whose suspension has not been altered by use of a Lift Kit." According to the complaint, the Lift Kit "alters the engineering dynamics and mechanics to such an extent that when a motor vehicle with altered suspension is driven on a public highway and is involved in a crash with a motor vehicle without altered suspension, the bumpers and fenders do not meet, and the bumper, fenders, and entire body of the vehicle with altered suspension override the entire body of the unaltered vehicle, with the result that there is intrusion of the altered vehicle's bumper, fenders, and body directly into the passenger compartment of the unaltered vehicle." The complaint charged that Alpa sold the Lift Kit to Smith on or about November 24, 1982 for installation on his 1982 Ford Bronco.

Plaintiffs' strict liability claims against the three corporate defendants averred that the Lift Kit was "defective and unreasonably dangerous because it raised the bumper height of the vehicle on which it was installed to a height that would cause the vehicle to ride over another vehicle in a collision"; and was further defective for failure of the corporate defendants "to warn consumers and users of the product of its defective and unreasonably dangerous condition."

As to the negligence counts against the corporate defendants, the complaint averred that they had a duty, which they failed to exercise, "to design, test, and inspect the Lift Kit so as to render it free of defects and reasonably safe for its reasonably foreseeable and intended uses, and to warn consumers and users of the Lift Kit of any defects and unreasonably dangerous conditions."

The corporate defendants moved for summary judgment. They claimed that the plaintiffs' sole contention of defect relating to the F–1540 Lift Kit was that it raised the

bumper of the Bronco to a height that would cause it to ride over another vehicle in a collision. The defendants asserted in their motions that the bumper height on the Bronco was in compliance with Code (1987 Repl.Vol.), § 22–105 of the Transportation Article, which sets a maximum bumper height of 28 inches for a multipurpose vehicle like the 1982 Bronco.[3] The defendants asserted that the legislature adopted this standard as a safe bumper height and, in so acting, "clearly contemplated possible hazards associated with disparate bumper heights in vehicle collisions." They maintained that since the plaintiffs "failed to produce evidence of any special circumstances or dangers beyond those addressed by the statute, compliance with the statute precludes a finding of defect or negligence" as a matter of law.

In support of the summary judgment motions was the affidavit of Dr. James A. Kirk, a professor of mechanical engineering at the University of Maryland. It was thereby shown that, after the 1987 collision, Smith's insurer declared the Bronco a total loss; that Trailmaster asked Dr. Kirk to replicate the Bronco; that Kirk and his team recreated the vehicle precisely as it existed at the time of the accident, using the same model Bronco, similar tires, and an identical F–1540 Lift Kit. It was further shown in the affidavit that the Ford Motor Company was contacted to ascertain and duplicate the original Bronco's gross vehicular weight rating (GVWR). Thereafter, Kirk moved the replica to a level surface and measured its bumpers in accordance with the Code of Maryland Regulations (COMAR) for vehicle inspection.[4] Kirk determined the height

---

3. The 1982 Bronco qualifies as a Class M multipurpose vehicle for purposes of § 22–105. Code (1977, 1984 Repl.Vol.), § 11–136.1(1) of the Transportation Article defines multipurpose vehicles as including any motor vehicle that "is designed primarily for carrying persons which is constructed on a truck chassis or with special features for occasional off-road operations."

4. COMAR § 11.14.02.07(1)(a) specifies in part: "Class M multipurpose vehicle measurement shall be made from the level surface on which the vehicle stands to the bottom edge of the main horizontal bar of the

of the front bumper to be 23–5/8 inches at its center, 24–7/8 inches at its right end, and 25 inches at its left end.[5]

In opposition to the summary judgment motions, the plaintiffs filed the affidavit of David O. McAllister, an "accident reconstruction consultant." He held a Bachelor of Science degree in Transportation and was formerly a traffic engineer with the Virginia Department of Transportation. Since 1974, he had supervised a team of private accident investigators; he claimed to have participated in the reconstruction of nearly a thousand motor vehicle crashes.

In his affidavit, McAllister said that, having investigated the accident between Smith's Bronco and Beatty's Honda, the Bronco had in fact overridden the hood of the Honda and caused more extensive injury than it would have without the Lift Kit. He opined that a vehicle equipped with a Lift Kit was foreseeably unsafe and unreasonably dangerous insofar as it would predictably override the bumper and hood of a vehicle with which it crashed, such as Beatty's Honda, and intrude into the passenger compartment. McAllister specifically stated that

a bumper that exceeds 24 inches violates standards promulgated by the Vehicle Equipment Safety Commission (VESC), a former standard by the Specialty Equipment Manufacturers Association (SEMA), a trade association, and by the American Association of Motor Vehicle Administrators (AAMVA).

Under the distinct impression that Smith's Bronco may have violated published safety standards, the trial court (DeWaters, J.) denied the motions for summary judgment.

Thereafter, on October 22, 1991, the defendants deposed McAllister. They had obtained from him a copy of the

---

bumper exclusive of any horizontal or vertical extension bars or bumper guards."

5. A standard 1982 Ford Bronco, unchanged from the assembly line, has a front bumper height of 19 inches at its center.

VESC standard he had referred to in his affidavit, entitled "Regulation VESC–12: Minimum Requirements for Construction and Equipment of Specialty Motor Vehicles." The VESC standard provided that the maximum recommended bumper height of a vehicle with a GVWR of less than 4,500 pounds was 24 inches; for vehicles between 4,501 and 7,500 pounds, the standard was 27 inches. In his deposition, McAllister acknowledged that the GVWR of the 1982 Ford Bronco was somewhere between 5,400 and 6,300 pounds. McAllister also admitted that the SEMA and AAMVA standards he had mentioned in his affidavit were derived from and, with respect to the 1982 Bronco, were identical to the VESC standard. Thus, McAllister conceded in his deposition that he was mistaken in his affidavit concerning a 24–inch standard, and that Smith's Bronco, in fact, complied with the relevant 27–inch VESC, SEMA, and AAMVA safety standards.[6]

---

**6.** The VESC, SEMA, and AAMVA standards apparently represent the only known published standards pertaining to bumper heights, other than those promulgated by state legislatures. VESC is primarily a safety commission, composed of safety officers and motor vehicle administrators from several states. AAMVA is also an association of state motor vehicle administrators. SEMA, by contrast, is a specialty equipment trade association. Thus, there appears to be no unified "industry standard" around which automobile companies have coalesced.

The federal government, for its part, has at least twice declined to regulate bumper heights. 56 Fed.Reg. 7826–01 (1991); 49 Fed.Reg. 34049–01 (1984). The National Highway Traffic Safety Administration (NHTSA) has preferred to leave bumper height regulation to the states:

While some vehicle types clearly require greater ground clearance than passenger cars, NHTSA is aware of potential safety problems associated with vehicles whose bodies are significantly raised above their usual design height. These potential safety concerns include more intrusion to struck passenger vehicles and reduced vehicle stability and braking performance. NHTSA's safety standards, however, apply only to new vehicle manufacturers. The agency does not have the legal authority to regulate subsequent vehicle modifications by individual owners. By contrast, the states can regulate subsequent modifications much more effectively through their motor vehicle registration and inspection programs.

156 Fed.Reg. 7826–01 (1991).

As to the altered Bronco's dangerousness, McAllister maintained that "I don't necessarily believe or think that the [27–inch] VESC–12 standard is the safest. I think it is too liberal. I think it is too high." McAllister cited no scientific studies to support his opinion that the VESC standard was inadequate, nor did he indicate that others in the field of automobile safety shared his view. He simply insisted throughout his deposition that the altered Bronco bumper was foreseeably unsafe and unreasonably dangerous for operation on public streets, given its height of approximately 24 inches. When asked if the Bronco would still be dangerous at 23 or 21 inches, he opined that it would be safer by degrees but "certainly more dangerous than the one at 18 or 19." When pressed to name the bumper height limit he would recommend, he responded, "19 inches."

In his deposition, McAllister stated, in answer to inquiries by plaintiffs' counsel, that the Lift Kit was an unreasonably dangerous addition to the Ford Bronco. He said that the modification made the vehicle "a foreseeable unsafe or less safe vehicle than what it was at stock" and that the defendants should have been so aware because the Ford Owner's Manual clearly stated "that the vehicle should not be raised with after market kits." The Owner's Manual was neither offered nor received as an evidentiary exhibit at the deposition.

After deposing McAllister, the defendants renewed their motion for summary judgment. They argued that McAllister had misled the trial court in his original affidavit by stating that the Bronco, with a bumper height around 24 inches, may have violated safety standards. The defendants pointed out that, by McAllister's own admission, Smith's Bronco complied with the Maryland statute regulating bumper heights and with all known safety standards. The trial court (Smith, J.) agreed, and on March 30, 1992, it granted the motions for summary judgment. The plaintiffs appealed. We granted certiorari prior to consideration of the case by the Court of Special Appeals.

## II

The plaintiffs argue that the trial court erred in granting the motions for summary judgment. They rely upon their expert's statements, in his affidavit and deposition, that the Lift Kit was defective and unreasonably dangerous, even though it may have been in compliance with § 22–105 of the Transportation Article and industry standards. The plaintiffs claim that a genuine dispute of material facts existed as to those standards. As to this, the plaintiffs point out that our cases make clear that compliance with a statutory standard does not preclude either a finding of negligence for failure to take additional precautions or a finding of defectiveness in a strict products liability case. Plaintiffs suggest that the 28–inch bumper height limit authorized in the statute is only a measure above which the bumpers of no vehicle may be raised. They also point to their expert's deposition testimony that the use of the defendants' Lift Kit violated the Ford owner's manual in that it alters the vehicle's stability, impairs its handling in braking and cornering maneuvers, and thereby required appropriate warnings.[7] The plaintiffs emphasize that they produced expert evidence and demonstrated that circumstances existed in which mere compliance with the statute was insufficient as a matter of law since a reasonable person would have done more, thereby permitting a jury to find that the Lift Kit product was defective and that the defendants failed to warn users of its defective and unreasonably dangerous condition.

Plaintiffs also argue in opposing summary judgment that the defendants violated a "common law duty to warn or that [they] produced a product which reduced the effectiveness of the Bronco's bumpers or made [it] dangerous in the event of a collision with Beatty's Honda Civic." The plaintiffs maintain that nothing in the statute (§ 22–105) was intended to preempt the common law or to indicate that the

---

7. McAllister acknowledged in his deposition that none of these claimed deficiencies in any way caused or contributed to the accident.

legislature deemed any vehicle's bumper heights as safe, regardless of the degree to which that vehicle was modified, as long as the bumper height was 28 inches or less.

### III

Under Maryland Rule 2–501(a), a motion for summary judgment may be filed "on the ground that there is no genuine dispute as to any material fact and that the party is entitled to judgment as a matter of law." Under subparagraph (b) of the rule, when the motion is supported by affidavit, "an opposing party who desires to controvert any fact contained in it may not rest solely upon allegations contained in the pleadings, but shall support the response by an affidavit or other written statement under oath." Subparagraph (c) of the rule requires that an affidavit opposing a motion for summary judgment shall set forth, *inter alia*, "such facts as would be admissible in evidence." Subparagraph (e) of the rule directs that the court shall enter judgment in favor of the moving party "if the motion and response show that there is no genuine dispute as to any material fact and that the party in whose favor judgment is entered is entitled to judgment as a matter of law."

It is thus clear that under Maryland's summary judgment rule a trial court determines issues of law; it makes rulings as a matter of law, resolving no disputed issues of fact. *Heat & Power v. Air Products*, 320 Md. 584, 591, 578 A.2d 1202 (1990). In this regard, the standard for appellate review of a trial court's grant of a motion for summary judgment is simply whether the trial court was legally correct. *Id. See also King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985).

Our cases recognize that in order to defeat a motion for summary judgment, the opposing party must show that there is a genuine dispute as to a material fact by proffering facts which would be admissible in evidence. *See Hoffman Chev. v. Wash. Co. Nat'l Sav.*, 297 Md. 691, 711–15, 467 A.2d 758 (1983); *Shaffer v. Lohr*, 264 Md. 397,

404, 287 A.2d 42 (1972); *Broadfording Ch. v. Western Md. Ry.*, 262 Md. 84, 89, 277 A.2d 276 (1971). Consequently, mere general allegations which do not show facts in detail and with precision are insufficient to prevent summary judgment. *Lynx, Inc. v. Ordnance Products*, 273 Md. 1, 7–8, 327 A.2d 502 (1974). Moreover, a person opposing summary judgment cannot merely allude to the existence of a document and thereby hope to raise the specter of dispute over a material fact which would defeat a motion for summary judgment. *Brown v. Suburban Cadillac, Inc.*, 260 Md. 251, 256–57, 272 A.2d 42 (1971).

We take particular cognizance of the recent trilogy of cases decided by the Supreme Court in which it confirmed many of the above principles. · *See Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).[8] As the Supreme Court said in *Anderson, supra*, 477 U.S. at 247–48, 106 S.Ct. at 2509–10, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." (Emphasis in original.) Thus, when a movant has carried its burden, the party opposing summary judgment "must do more than simply show there is some metaphysical doubt as to the material facts." *Matsushita, supra*, 475 U.S. at 586, 106 S.Ct. at 1356. In other words, the mere existence of a scintilla of evidence in support of the plaintiffs' claim is insufficient to preclude the grant of summary judgment;

---

**8.** The summary judgment principles cited in *Celotex* were referred to by us in *Yamaner v. Orkin*, 310 Md. 321, 323, n. 4, 529 A.2d 361 (1987). Because the Maryland summary judgment rule is derived from the federal rule, judicial interpretations of the federal rule are persuasive as to the meaning and proper application of the Maryland rule. *See, e.g., Metropolitan Mtg. Fd. v. Basiliko*, 288 Md. 25, 27, 415 A.2d 582 (1980).

there must be evidence upon which the jury could reasonably find for the plaintiff. *Anderson, supra,* 477 U.S. at 252, 106 S.Ct. at 2512. We recognized in *Clea v. City of Baltimore,* 312 Md. 662, 678, 541 A.2d 1303 (1988), that while a court must resolve all inferences in favor of the party opposing summary judgment, "[t]hose inferences ... must be *reasonable* ones." (Emphasis in original.) In that case, we quoted Professor Wright, as follows:

"It is frequently said that summary judgment should not be granted if there is the 'slightest doubt' as to the facts. Such statements are a rather misleading gloss on a rule that speaks in terms of 'genuine issue as to any material fact,' and would, if taken literally, mean that there could hardly ever be a summary judgment, for at least a slight doubt can be developed as to practically all things human. A better formulation would be that the party opposing the motion is to be given the benefit of all reasonable doubts in determining whether a genuine issue exists."

312 Md. at 678, 541 A.2d 1303, quoting C. Wright, *The Law of Federal Courts* § 99, at 666–667 (1983). With these principles in mind, we consider whether the plaintiffs offered sufficient admissible evidence in their opposition to summary judgment to allow a jury to consider their claims of negligence and strict liability against the corporate defendants.

## IV

■ Plaintiffs claim that the defendants were negligent and strictly liable in manufacturing, designing, and marketing their Lift Kit product. Defendants' asserted liability rests upon this foundation: that the bumper height of the Bronco, raised by means of the Lift Kit some 4 inches above its original design, was foreseeably unsafe and unreasonably dangerous because it was too high, even though it was approximately 4 inches below the statutory maximum set by the legislature. It was upon this premise that McAllister, in his affidavit, stated that the installation of the Lift Kit upon the Bronco caused it to "override," not only the

bumper but also the body of the Honda with which it collided. This being so, McAllister opined that "the altered Bronco's impact force would not be absorbed by the bumper, engine compartment and fenders of the stricken vehicle, but instead the Bronco would intrude into the passenger compartment itself, thereby causing the driver more serious injuries than if the integrity of the passenger compartment had not been compromised." These statements in McAllister's affidavit purported to be based on his background, training and experience in the field of automobile accident reconstruction. He offered no additional scientific or other evidentiary support for his opinion that the Lift Kit, installed on the Bronco, was thereby foreseeably unsafe and unreasonably dangerous.

In his later deposition, McAllister acknowledged that the Maryland legislature, by its enactment of § 22–105, considered the matter of vehicle bumper heights and adopted the 28–inch standard for multipurpose vehicles like the Bronco. The thrust of McAllister's deposition testimony was simply that this statutory standard was not the "safest"; that it was "too liberal ... too high." That McAllister personally believed that neither the statutory 28–inch bumper height standard, nor the 24–inch bumper height of the Bronco, was not as safe as it should have been, without more, does not create a genuine issue of material fact. Nor did his deposition testimony that the Ford manual specified that the Bronco should not be raised by "after market kits" create a genuine issue of material fact. As earlier observed, the manual was neither offered nor received as a deposition exhibit. Consequently, McAllister's affidavit and deposition, taken together, simply do not provide admissible evidence creating a genuine issue of material fact tending to show that the Lift Kit was foreseeably unsafe and unreasonably dangerous. Without more, McAllister's opinion that the defendants were negligent and their product unreasonably dangerous, despite compliance with the statutory standard, is insufficient evidence to survive summary judgment particularly when the expert cites neither developing consensus nor sound data to buttress his opinion.

■ Our cases hold that " 'an expert's opinion is of no greater probative value than the soundness of his reasons given therefor will warrant.' " *Surkovich v. Doub,* 258 Md. 263, 272, 265 A.2d 447 (1970), and cases there cited. Otherwise stated, we have said that " '[a]n expert's judgment has no probative force unless there is a sufficient basis upon which to support his conclusions.' " *Bohnert v. State,* 312 Md. 266, 275, 539 A.2d 657 (1988). In this regard, we said in *State Health Dep't v. Walker,* 238 Md. 512, 520, 209 A.2d 555 (1965), that an expert opinion "derives its probative force from the facts on which it is predicated, and these must be legally sufficient to sustain the opinion of the expert." Specifically, we noted:

The premises of fact must disclose that the expert is sufficiently familiar with the subject matter under investigation to elevate his opinion above the realm of conjecture and speculation, for no matter how highly qualified the expert may be in his field, his opinion has no probative force unless a sufficient factual basis to support a rational conclusion is shown. *State, Use of Stickley v. Critzer,* 230 Md. 286, 186 A.2d 586, and cases cited therein; *Hammaker v. Schleigh,* 157 Md. 652, 147 Atl. 790. The opinion of an expert, therefore, must be based on facts, proved or assumed, sufficient to form a basis for an opinion, and cannot be invoked to supply the substantial facts necessary to support such conclusion. The facts upon which an expert bases his opinion must permit reasonably accurate conclusions as distinguished from mere conjecture or guess. *Marshall v. Sellers,* 188 Md. 508, 53 A.2d 5.

*Id.* In *Evans v. State,* 322 Md. 24, 585 A.2d 204 (1991), we rejected the argument that the adequacy of the basis for the opinion of an expert goes only to the weight to be given to the expert's testimony, and not to its admissibility as evidence. *See Hartless v. State,* 327 Md. 558, 611 A.2d 581 (1992), in which we restated the law so well expressed in our *Walker* case, emphasizing that an expert's reliance on

hearsay statements of others is not ordinarily an adequate basis upon which to predicate the expert's opinion.

It is undisputed that the Lift Kit performed the function for which it was designed and marketed. When Smith purchased the Lift Kit in 1982 and installed it, there was no statute governing bumper heights for multipurpose vehicles like the Ford Bronco. Code (1977), § 22–105 of the Transportation Article dealt only with alterations to vehicle bumpers in Class A (passenger vehicles) and Class E (half or three-quarter ton trucks). That statute prohibited willful or intentional alteration of these vehicles in any manner that would reduce the effectiveness of their bumpers in the event of a collision with another vehicle. This statute was amended to include multipurpose vehicles by ch. 508 of the Acts of 1984, codified as Code (1984 Repl.Vol., 1986 Cum. Supp.), § 22–105 of the Transportation Article. It provided that, notwithstanding any provision of law to the contrary, a person could not operate, *inter alia,* a multipurpose vehicle "with a bumper that exceeds a height of 28 inches." The substance of this statute was in force at the time of the 1987 collision in this case. *See* Code (1987), § 22–105 of the Transportation Article.[9]

▉ It is readily apparent that the Maryland legislature has considered the issue of vehicle bumper heights for the

---

9. Section 22–105 was again amended by ch. 298 of the Acts of 1989. It now reads:

(a) *In general.*—If any Class A (passenger) vehicle, any Class E truck with a manufacturer's rating or registered gross vehicle weight of 18,000 pounds or less, or any Class M (multipurpose) vehicle has been altered in any manner that would reduce the effectiveness of its bumpers or render the vehicle dangerous in the event of a collision with another vehicle, it may not be operated on any highway in this State. The Motor Vehicle Administration and the Automotive Safety Enforcement Division of the Maryland State Police jointly shall adopt rules and regulations relating to bumpers as used in this section.

(b) *Class A (passenger) vehicles.*—Notwithstanding any provision of law to the contrary, a person may not operate a vehicle on any highway in the State if the manufacturer's original design specifications for the vehicle have been altered in any manner that causes the height of the vehicle's bumper to exceed:

purpose of protecting the public from any dangers posed by mismatched bumpers on colliding vehicles and has adopted governing standards in § 22–105 of the Transportation Article. Manifestly, the statutory scheme contemplates varying bumper heights on vehicles used on public highways, specifying differing bumper heights for differing classes of vehicles. As the defendants point out, the statute contemplates that bumper heights between multipurpose and Class A vehicles may vary between 8 or more inches; between Class E trucks, with a current maximum permitted bumper height of 30 inches, and Class A vehicles, bumper heights may vary by 10 or more inches. Because the statutory purpose is to define a condition which would "render the vehicle dangerous in the event of a collision with another vehicle," § 22–105(a), the mere fact that the Bronco's bumper was higher than that of the Honda does not render the Lift Kit "defective" or "unreasonably dangerous." Indeed, the legislative scheme plainly contemplates that bumper mismatch between different classes of vehicles is an inevitable occurrence and, as such, sanctioned by the legislature as a matter of public policy.

▆▆▆ Our cases recognize, however, that compliance with a statute does not necessarily preclude a finding of negligence or product defectiveness where a reasonable person would take precautions beyond the statutorily required measure. *See Ellsworth v. Sherne Lingerie, Inc.,* 303 Md. 581, 495 A.2d 348 (1985); *Leonard v. Sav–A–Stop Services, Inc.,* 289 Md. 204, 424 A.2d 336 (1981); *Restatement, (Second) of Torts,* § 288C (1965). But where no special circumstances require extra caution, a court may find that con-

---

(1) In the case of a Class A (passenger) vehicle, 20 inches;

(2) In the case of a Class M (multipurpose) vehicle, 28 inches;

(3) In the case of a Class E truck with a manufacturer's rating or registered gross vehicle weight of 10,000 pounds or less, 28 inches; or

(4) In the case of a Class E truck with a manufacturer's rating or registered gross vehicle weight of more than 10,000 pounds but not more than 18,000 pounds, 30 inches.

formity to the statutory standard amounts to due care as a matter of law. *Restatement,* § 288C, comment *a;* W. Prosser and W. Keeton, *The Law of Torts,* § 36 at 233 (5th ed. 1984). *See also Josephson v. Meyers,* 180 Conn. 302, 429 A.2d 877 (1980); *Pickering v. State,* 57 Haw. 405, 557 P.2d 125 (1976); *Jones v. Hittle Service, Inc.,* 219 Kan. 627, 549 P.2d 1383 (1976); *Westinghouse Elec. Corp. v. Nutt,* 407 A.2d 606 (D.C.App.1979). We see no special circumstances in this case preventing the application of the statutory standard as a matter of law, applicable to both the negligence and strict liability claims. Consequently, we think the trial judge was correct in granting summary judgment for the defendants where the expert's opinion did not adequately create a genuine issue of material fact that the defendants' Lift Kit product, either for negligence or strict liability purposes, was foreseeably unsafe, defective, or unreasonably dangerous. This is so notwithstanding the fact that the Lift Kit device raised the Bronco's suspension by some 4 inches above its original design with the result, as with other bumper mismatches, that it may ride over another vehicle having a lesser bumper height in a collision.

*JUDGMENT AFFIRMED, WITH COSTS.*

ROBERT M. BELL, J., concurs in the result only.