669 A.2d 773

**GENERAL ACCIDENT INSURANCE COMPANY**

v.

**Florence E. SCOTT, et al.**

**No. 901, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Jan. 3, 1996.

Anthony D. Dwyer (Law Offices of Michael P. DeGeorge, on the brief), Columbia, for appellant.

Leslie L. Gladstone of Baltimore, for appellee, Scott.

Gregory L. VanGeison (Robert H. Bouse, Jr. and Anderson, Coe & King, on the brief), Baltimore, for appellees.

Argued before WILNER, C.J., HOLLANDER, J., and JOHN J. GARRITY, Judge (retired), Specially Assigned.

HOLLANDER, Judge.

In this case, we are asked to resolve a dispute concerning underinsured motorist coverage. Florence E. Scott, appellee and cross-appellant, was injured in a two-car collision. At the time, she was one of several passengers in a car operated by Norvin Jones that was insured by the Hartford Accident & Indemnity Company ("Hartford"), appellee. Jones's car was struck from behind by a vehicle driven by William Bain, Jr.; that car was owned by Valencia Watson (who was a passenger) and insured by State Farm Mutual Insurance Company ("State Farm"). Approximately two and one half years after the accident, when Watson's liability policy was insufficient to compensate Scott for her injuries, Scott made demand on her own insurer, General Accident Insurance Company ("General Accident"), appellant and cross-appellee, pursuant to the underinsured motorist provisions of Scott's policy.

When General Accident denied Scott's claim, she instituted a declaratory judgment action in the Circuit Court for Baltimore City to determine the responsibilities of Hartford and General Accident. Scott and General Accident filed cross-motions for summary judgment. After a hearing, the circuit court (Gordy, J.) granted summary judgment in favor of Scott and against General Accident. At a later date, summary judgment was entered in favor of Hartford.

General Accident now appeals and presents the following issues for our review, which we have rephrased slightly:

I.   Did the trial court err in entering summary judgment in favor of Scott even though Scott unreasonably notified General Accident two years and five months after the accident and only after a finding by an arbitrator on both liability and damages?

II.   Did the trial court err in finding that General Accident, not Hartford, must indemnify Scott for the underlying judgment after the culpable car's insurance carrier, State Farm, paid its $25,000 limit of liability, even though the Hartford single limit of $50,000 exceeded the State Farm policy's $25,000 per person limit of liability?

We answer both questions in the negative; therefore, we shall affirm.

## FACTUAL BACKGROUND

On January 27, 1991, Scott was injured in an automobile accident in the District of Columbia. At the time, Scott was a passenger in a car driven by Norvin Jones that was owned by Security America ("the Jones vehicle"). Jones's daughters, Aleesha and Sherice Jones, and Talika Brown were also passengers. The Jones vehicle allegedly was stopped at a red light and was struck in the rear by the car behind it, which was driven by Bain and owned by Watson ("the Watson vehicle"). All of the occupants of the Jones vehicle were injured in the accident.

Three groups of insurance policies are relevant to this case. The Jones vehicle was insured under a policy issued by Hartford which provided uninsured/underinsured coverage[1] up to $50,000 per accident. The Watson vehicle was insured by State Farm, whose policy provided liability coverage up to $25,000 for each person injured in an accident, with a maximum liability of $50,000 per occurrence. Scott's General Accident policy, insuring her personal vehicle, provided uninsured motorist protection up to $50,000 for each person injured in an accident, with a maximum coverage of $100,000 per occurrence.

Following the accident, Scott retained an attorney, Leslie Gladstone, who investigated the incident and began the process of seeking compensation for her injuries. Given the relatively low coverage limits of Watson's policy with State Farm ($25,000 per person and $50,000 per accident), Gladstone recognized that Scott might need to make an uninsured motorist claim and he informed Hartford of the accident. Apparently, Gladstone was incorrectly informed that the Hartford's uninsured motorist policy limit was $500,000 per accident. As

---

**1.** Hereinafter, for convenience, we shall refer to underinsured motorist protection as uninsured motorist protection, as the terms are frequently used interchangeably.

a result, Gladstone evidently felt that Scott would not need to make any claim on her own uninsured motorist policy with General Accident and he did not notify General Accident of the occurrence. In November 1992, the occupants of the Jones vehicle, including Scott, filed suit against Bain and Watson in the Superior Court of the District of Columbia. As permitted by that court's rules of procedure, the parties agreed to submit the case to non-binding arbitration. A hearing was held before an arbitrator in May 1993, who found in favor of Scott and the other plaintiffs. Scott was awarded damages in the amount of $61,610.60, and the other plaintiffs were awarded damages totalling $29,740.08. It is undisputed that, as of this time, General Accident still knew nothing of these proceedings.

After the arbritrator made her award, the other plaintiffs accepted a total of $25,000 from Watson's $50,000 State Farm insurance policy. Consequently, $25,000 remained on State Farm's policy to cover Scott's award of $61,610.60. Thereafter, Gladstone learned that the Hartford *liability* limit was $500,000, but that its uninsured motorist coverage was only $50,000. Accordingly, on June 10, 1993, some two years and five months after the accident, Gladstone's associate notified General Accident of the accident and Scott's claim under her policy. That telephone call was followed by a letter to General Accident the next day.

Gladstone sought to cooperate with General Accident in minimizing any harm resulting from the delay in notice. As permitted by the Superior Court's rules on non-binding arbitration, he delayed the entry of a final judgment on the arbitration award by filing a request for a trial *de novo*. Counsel also sought to give General Accident the opportunity to intervene in the litigation to protect its rights. On June 16, 1993, Gladstone wrote to Reggie Lemon, a General Accident adjuster assigned to Scott's claim. He offered to provide General Accident a thirty day period to investigate the accident and to decide on its course of action. Gladstone wrote:

> I do not wish to do anything, however, that would be deemed prejudicial to the interest of General Accident

Insurance Company and I am willing to provide any reasonable period of time for you to properly investigate this matter as well as to defend it as you deem appropriate.

Gladstone also told Lemon to let him know whether he needed additional time to complete his investigation, and said that he would withdraw his request for a trial *de novo* if he did not hear anything within thirty days. In addition, counsel asked Scott to contact General Accident to provide a statement regarding the accident.

General Accident never responded to Gladstone. Accordingly, on July 14, 1993, Gladstone sent another letter to Lemon, advising him that he would withdraw his request for a trial *de novo* on July 16, unless Lemon requested otherwise. When Gladstone did not receive a response, he called Lemon on July 29, 1993 to ask him about General Accident's position. Lemon responded that, in General Accident's view, Hartford had the responsibility to provide Scott with uninsured motorist benefits. Lemon added that General Accident had referred the matter to its attorney. Gladstone then called the attorney and left a message, but received no response.

On July 30, 1993, Scott's counsel formally withdrew his request for a trial *de novo* in the Superior Court. Consequently, a judgment on the arbitration award was entered on August 16, 1993.

Meanwhile, Hartford also refused to make any payments to Scott under the uninsured motorist provision of its policy. Hartford took the position that, because the $50,000 liability limit under the State Farm policy was the same as its $50,000 uninsured limit, the Watson vehicle was not an "underinsured" vehicle under the policy, and thus Hartford had no obligation to pay. With both insurance carriers denying coverage, Scott filed her declaratory judgment action against the insurers on September 16, 1993.

Scott and General Accident each moved for summary judgment. General Accident argued that Scott had forfeited coverage under the policy because Scott had unreasonably waited twenty-nine months after the accident before informing Gen-

eral Accident of her claim, and the insurer was prejudiced by the inordinate delay. General Accident also argued that Hartford should be the primary uninsured motorist insurance carrier, and thus General Accident should not have any obligation to pay until Hartford's coverage was exhausted. Hartford reiterated its position that the Watson vehicle was not an uninsured vehicle under its policy.

After a hearing on the cross-motions on March 11, 1994, the circuit court rejected General Accident's untimely notice argument and accepted Hartford's contention that the Watson vehicle was not underinsured under its policy. Accordingly, it entered summary judgment in favor of Scott and against General Accident, and denied General Accident's motion against Scott. The order made no mention of Hartford, however, presumably because Hartford was not a movant. Nor did the court ever enter a formal declaratory judgment, as Scott had requested in her complaint for declaratory judgment.

General Accident noted an appeal to this Court. Under Rule 2–602(a), an order that "adjudicates the rights and liabilities of fewer than all the parties to the action . . . is not a final judgment." Since the circuit court's order of March 11, 1994 did not adjudicate the rights and liabilities of Hartford, it was not a final judgment and, therefore, this Court lacked jurisdiction. Once advised of the problem, Scott and General Accident filed a joint motion under Rule 8–602(e)(1), seeking a remand to the trial court. Accordingly, on December 13, 1994, this Court remanded the case to the circuit court "so that the Court may direct the entry of a final declaratory judgment as to all parties."

Scott and General Accident then submitted proposed orders to the trial judge, seeking to adjudicate the rights and obligations of all three parties to the litigation. Both of the proposed orders explicitly provided that "Hartford shall not be liable to" Scott under its insurance policy and that "judgment is hereby entered in favor of Hartford." The proposed orders differed only in that Scott's version sought 5% interest from

August 16, 1993, the date on which she obtained her judgment against Watson and Bain. On April 18, 1995, the judge executed General Accident's proposed order, which did not provide for an award of interest. General Accident then pursued the instant appeal.

Scott and General Accident have informed us in their briefs that, during the pendency of this appeal, the judgment on the arbitration award entered in the Superior Court of the District of Columbia has been vacated at the request of Watson and Bain. Consequently, the case has been returned to the civil docket of the Superior Court for a trial on the merits that is now pending.

We will provide additional facts as they pertain to our discussion of the issues presented.

### STANDARD OF REVIEW

Maryland Rule 2–501 provides that a court shall enter summary judgment on the motion of a party where "there is no genuine dispute as to any material fact and . . . the party is entitled to judgment as a matter of law." It is fundamental that a summary judgment proceeding is not a substitute for trial. *Maloney v. Carling National Breweries, Inc.*, 52 Md. App. 556, 559, 451 A.2d 343 (1982). Thus, the court's task is not to decide disputed facts. *Coffey v. Derby Steel Co.*, 291 Md. 241, 247, 434 A.2d 564 (1981). Rather, it is to determine whether there are disputes as to "material" facts, *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 283 Md. 296, 326, 389 A.2d 887 (1978), whose resolution would somehow affect the outcome of the case. *King v. Bankerd*, 303 Md. 98, 111, 492 A.2d 608 (1985). In reviewing a trial court's grant of summary judgment, an appellate court must also determine whether the trial court's ruling was legally correct. *Baltimore Gas and Electric Co. v. Lane*, 338 Md. 34, 43, 656 A.2d 307 (1995); *Nationwide Mutual Insurance Co. v. Scherr*, 101 Md.App. 690, 694, 647 A.2d 1297 (1994).

In order to defeat a motion for summary judgment, the opposing party must show with some particularity that there

is a genuine dispute as to a material fact. *Beatty v. Trailmaster Products, Inc.*, 330 Md. 726, 737, 625 A.2d 1005 (1993). In determining whether there are any material facts in dispute, the trial court must give the non-moving party the benefit of all reasonable inferences and must resolve all inferences in the light most favorable to the non-moving party. *Id.* at 739, 625 A.2d 1005; *Clea v. City of Baltimore*, 312 Md. 662, 678, 541 A.2d 1303 (1988). But "general allegations which do not show facts in detail and with precision are insufficient to prevent summary judgment." *Beatty, supra*, 330 Md. at 738, 625 A.2d 1005. Nor are mere conclusory denials or allegations sufficient to overcome a motion for summary judgment. *See Seaboard Surety Co. v. Richard F. Kline, Inc.*, 91 Md.App. 236, 243, 603 A.2d 1357 (1992). As the Court said in *Beatty*, "the mere existence of a scintilla of evidence in support of the plaintiff's claim is insufficient to preclude the grant of summary judgment." *Id.*, 330 Md. at 738, 625 A.2d 1005.

## DISCUSSION

### I.

The uninsured motorist provision of Scott's insurance policy with General Accident provides:

No judgment for damages arising out of a suit brought against the owner or operator of an "uninsured motor vehicle" is binding on us unless we:

1.   Received reasonable notice of the pendency of the suit resulting in the judgment; and

2.   Had a reasonable opportunity to protect our interests in the suit.

General Accident contends that, by informing the company of her claim twenty-nine months after the accident, Scott did not provide "reasonable notice" of her suit and denied appellant a "reasonable opportunity" to protect its interests. It also vigorously argues that, as a matter of law, it was prejudiced by the untimely notice, because it could not investigate and defend the claim.

In a case involving an insurer's allegation that its insured has forfeited coverage based on a failure to provide timely notice of the claim, the court must determine two issues: (1) whether the delay was, under all the surrounding circumstances, a reasonable one, *Lennon v. American Farmers Mutual Insurance Co.*, 208 Md. 424, 430, 118 A.2d 500 (1955); *American Casualty Co. v. Purcella*, 163 Md. 434, 437, 163 A. 870 (1933); and (2) whether the insurer suffered any prejudice. 8C John Alan Appleman & Jean Appleman, Insurance Law and Practice § 5083.35 at 293–94 (1981). Whether a delay is reasonable depends on its length and the reason for it. Appleman, *supra*, § 5083.25 at 286–88 (1981); *State Farm Mutual Automobile Insurance Co. v. Burgess*, 474 So.2d 634 (Ala.1985). If the delay is reasonable, then the court's inquiry is at an end, because the insured's actions would not constitute a breach of the policy provision. If the delay is unreasonable, however, the insurer may avoid coverage only if it proves, by a preponderance of the evidence, that it suffered prejudice from the delay. *See* Appleman, *supra*, § 5083.35 at 293–94. The insurer will avoid summary judgment if it raises genuine disputes of material fact regarding these issues.

General Accident claims that Scott's delay was unreasonable. It relies on the undisputed fact that the notification occurred almost two and one-half years after the accident. It also contends that Scott's reason for the delay—that she thought that the Hartford policy provided adequate uninsured motorist coverage—does not justify the delay. But we need not resolve whether General Accident generated a genuine dispute on the reasonableness issue, because we conclude that its factual allegations were insufficient to raise a genuine dispute on the issue of prejudice.

We turn, then, to consideration of the prejudice issue. Simply put, the question we must address distills to this: What constitutes "prejudice" in the context of this case? General Accident essentially claims that it established prejudice based on Scott's inordinate delay in providing notice. It asserts:

Even if General Accident could not identify specific instances of prejudice, this would not mean that it has not been prejudiced.... This extremely tardy notice made it impossible for General Accident to carry out the functions that prompt notice enables it to fulfill, such as easily locating witnesses, interviewing witnesses while the accident is fresh in their minds, observing the physical condition of the scene before it changes, promptly evaluating liability, settling claims early and hopefully at a lower cost, preparing a defense, rapidly evaluating the claim and promptly investigating....

In our consideration of the degree of prejudice that must be shown by the insurer, we are guided by Md.Code Ann., art. 48A, § 482 (1994).[2] It requires, in the liability insurance context, that an insurer must prove *actual prejudice.* Section 482 provides:

Where any insurer seeks to disclaim coverage on any policy of liability insurance issued by it, on the ground that the insured or anyone claiming the benefits of the policy through the insured has breached the policy by failing to cooperate with the insurer or by not giving requisite notice to the insurer, such disclaimer shall be effective only if the insurer establishes, by a preponderance of the evidence[,] that such lack of cooperation or notice has resulted in *actual prejudice* to the insurer.

(Emphasis added).

We also note that Md.Ann.Code art. 48A, § 541(c)(2) (Supp. 1995) requires that "every policy of motor vehicle liability insurance ... shall contain" uninsured motorist coverage. Arguably, § 482 applies to uninsured motorist coverage, because that kind of coverage is a *part* of the liability insurance policy. *See* Andrew Janquitto, *Maryland Motor Vehicle Insur-*

---

**2.** The General Assembly enacted § 482 in 1964 in response to the decision in *Watson v. United States Fidelity & Guaranty Co.,* 231 Md. 266, 189 A.2d 625 (1963). There, the Court had determined that an insurer did not have to show that it had suffered prejudice in order to disclaim coverage due to an unreasonably delayed notification.

ance § 8.12 at 354 n. 469 (1992) (§ 482 applies to uninsured motorist insurance).

■ But we need not decide whether § 482 actually applies to uninsured motorist coverage.[3] Regardless of the specific applicability of § 482, the uninsured motorist carrier must confront many of the same considerations that a liability insurer must consider, such as who caused the accident and the nature and extent of injuries sustained by the insured. Thus, in our view, an insurer cannot avoid coverage under an uninsured motorist policy on the grounds of an unreasonably late notice, unless the insurer proves that it suffered "actual prejudice."

■ The requirement of "actual prejudice" means that an insurer may not disclaim coverage on the basis of prejudice that is only possible, theoretical, conjectural, or hypothetical. *See* THE AMERICAN HERITAGE DICTIONARY at 7 (1983) (defining "actual" as "existing in fact; real", "existing or acting at the present moment"). Nor is it enough to surmise harm that may have occurred by virtue of the passage of time; prejudice cannot be presumed from the length of the delay. Strict adherence to the requirement of actual prejudice is particularly important in the context of uninsured motorist insurance, as there is a strong public policy in favor of uninsured motorist coverage. *See Nationwide Mutual Insurance Co. v. Webb,* 291 Md. 721, 436 A.2d 465 (1983) (holding void a provision in an uninsured motorist insurance policy that disallowed coverage unless the insured obtained the insurer's written consent to sue the tortfeasor). Thus, courts must be especially watchful against allowing insurers to avoid coverage on the basis of illusory harm.

With this background in mind, we analyze the facts. General Accident submitted an affidavit from German Busch, the claims manager of its Washington, D.C. office. Busch averred

---

3. The parties have not addressed the applicability of § 482 to uninsured motorist coverage. Nor do they discuss whether "actual prejudice" is the appropriate standard in the context of this case.

that: (1) General Accident "could not fully investigate the underlying facts," such as by taking "timely" statements from witnesses, "photographing any property damage," or investigating the scene of the accident; (2) it could not evaluate its potential exposure; (3) it could not participate in the decision as to whether to submit the case to arbitration; and (4) it could not decide whether to "set high/low parameters."

■ Applying the summary judgment principles that we outlined earlier, appellant's allegations were insufficient, as a matter of law, to raise a genuine dispute as to whether General Accident suffered actual prejudice; conclusory allegations about difficulties and inconveniences that would result from *any* delay in notification are not sufficient. General Accident failed to identify any specific, palpable instances to show how its ability to protect its interests was frustrated. To the contrary, General Accident conceded that it was unable to show that it had lost any important evidence, material witnesses, or meritorious defenses as a result of Scott's delay. *See* 46A C.J.S. *Insurance* § 1397 at 156 (1993) (insurer is prejudiced where either (1) it is denied all opportunity to investigate or evaluate the claim, or (2) the delay caused the loss of evidence that "would have led to a more advantageous result in the disposition of the action"). Indeed, at the hearing, the court asked General Accident's counsel what "meritorious defense" might he have raised in the District of Columbia litigation had General Accident been given earlier notice. Counsel responded: "I have no idea, quite frankly. I don't have anything with regard to the file. We haven't been able to interview any witnesses. There are several tortfeasors. I really don't know."

General Accident contends that it could not take "timely" statements from witnesses. But it never asserted that it tried to interview witnesses and was unable to do so. General Accident does not identify even a single person who was unavailable due to the lapse of time. Nor does it identify any particular witnesses who suffered memory losses, died, or were otherwise unavailable. Further, General Accident did

not articulate any difficulty in using the witness statements that had already been obtained by other interested parties.

It is also important to our analysis that, although appellant claims that it could not investigate the scene of the accident, it makes no claim that it ever attempted to investigate the accident or that important evidence disappeared. Nor does appellant identify with any particularity what material evidence is unavailable or how it was actually prejudiced as a result. An insurer cannot assert prejudice with regard to its ability to conduct an investigation that it never even tried to conduct. *See Country Mutual Insurance Co. v. Kuzmickas,* 2 Ill.App.3d 313, 276 N.E.2d 357, 359–60 (1971) (insurer could not claim that it was prejudiced by delay in notification where there was no evidence that it had made any sort of investigation after it did receive notification). *See also Hamill v. Nationwide Mutual Insurance Co.,* 499 S.W.2d 892, 897 (Tenn.Ct.App.1972) (liability insurer was not prejudiced by its lack of an inspection of an automobile where it made no request for an inspection and the testimony of an agent of the collision insurance carrier was made available to the liability insurer).

It is also salient to us that, in Gladstone's unrefuted affidavit, he states that he repeatedly offered to assist General Accident in its investigation of the accident, but General Accident failed to respond. Indeed, Gladstone first received a response almost two months after his office provided its first notification, and he then was informed that it was General Accident's position that only Hartford had the responsibility to pay. Thus, General Accident could have had full access to Gladstone's investigation of the accident.

Nor is this a case where the insured waited so long that she denied General Accident all opportunity to protect its rights in the litigation in the District of Columbia. As we have noted, trial on the merits has not yet occurred. Thus, General Accident is in virtually the same legal position that it would have occupied had it been notified of Scott's claim before the District of Columbia litigation began. We cannot accept Gen-

eral Accident's contention that it was denied a meaningful opportunity to investigate the accident and protect its rights. *See Washington v. Federal Kemper Insurance Co.*, 60 Md. App. 288, 482 A.2d 503 (1984), *cert. denied*, 302 Md. 289, 487 A.2d 292 (1985) (insurer prejudiced where insured did not inform insurer of pending suit until *after* adverse judgment was entered, thus denying insurer all opportunity to defend). We also consider it significant that, by the time notice was provided, the case had already gone through a non-binding arbitration proceeding, thus affording General Accident access to the parties' discovery and the claims asserted by the parties. In essence, the non-binding arbitration amounted to a "dress rehearsal" for the upcoming trial on the merits; the information available to the insurer thus far exceeded what otherwise would have been available to it.

General Accident presented allegations concerning possible prejudice that it may have suffered because an arbitration award had already been entered by the time it received notice from Scott. Although Scott stayed entry of judgment on the award and gave General Accident an opportunity to intervene, General Accident faced a motions deadline for the trial *de novo* only fifteen days after it received that notification. Furthermore, General Accident faced potentially increased exposure if it intervened in the case, because Superior Court rules provide that a party that chooses to have a trial *de novo* after an arbitration award is liable for certain fees and costs if its verdict at trial is not at least ten percent more favorable than its arbitration award. Superior Court Civil Arbitration Rule 10(c).[4] These allegations of prejudice are now moot, however, because the judgment on the arbitration award was stricken during the pendency of this appeal. Consequently, the matter is slated for a full trial on the merits in the Superior Court. General Accident no longer faces the prospect of penalties from an unfavorable verdict.

---

4. We need not address whether General Accident merely would have been entitled to an offset if it had to pay a penalty based on the arbitration rules.

Based on the foregoing, we hold that General Accident failed to raise a genuine dispute of material fact regarding prejudice. Accordingly, the circuit court did not err in granting summary judgment in favor of Scott.

## II.

General Accident contends that Hartford, as the uninsured motorist carrier for the Jones vehicle, should be the first carrier called upon to pay any judgment that Scott cannot collect from the tortfeasor. Hartford counters that it has no obligation to Scott because the Watson vehicle was not an "underinsured" vehicle under the terms of its policy.[5]

We shall first address Hartford's contention that we should dismiss General Accident's appeal and Scott's cross-appeal, because they "acquiesced" in the entry of judgment. Hartford focuses on the fact that, after it was discovered that the original judgment from which General Accident first appealed in 1994 was not final, Scott and General Accident submitted orders to the circuit court that provided for the entry of judgment in favor of Hartford. Although the order was requested so that General Accident and Scott could pursue the appeal, Hartford claims that the appeals must be dismissed because a party cannot acquiesce in a judgment and then appeal from it.

Hartford relies on the cases of *Osztreicher v. Juanteguy,* 338 Md. 528, 659 A.2d 1278 (1995), *Globe American Casualty Co. v. Chung,* 322 Md. 713, 589 A.2d 956 (1991), and *The Emersonian Apartments v. Taylor,* 132 Md. 209, 103 A. 423 (1918), in support of its position. These cases are distinguishable, however.

In *Osztreicher,* a pre-trial discovery ruling by the trial court caused one of the plaintiff's expert witnesses to refuse to testify. *Osztreicher,* 338 Md. at 531–32, 659 A.2d 1278. Al-

---

5. Scott agrees with Hartford's position but has noted a cross-appeal to protect her interests against Hartford if this Court were to reverse the judgment in favor of Hartford.

though the plaintiff had other expert witnesses and other evidence that he could have presented, the plaintiff believed that the court's ruling effectively destroyed his case, and thus protested the court's decision by refusing to present a case. *Id.* at 532–33, 659 A.2d 1278. The trial court proceeded to enter a directed verdict in favor of the defendant. *Id.* at 533, 659 A.2d 1278. Alleging that the court's discovery ruling was erroneous, the plaintiff appealed the judgment. The Court of Appeals dismissed the appeal, holding that where a party refuses to present evidence on an issue on which it has the burden of proof, even though it has the ability to present such evidence, the party acquiesces in an adverse judgment on the issue. *Id.* at 535, 659 A.2d 1278. Plainly, in *Osztreicher,* there were substantive issues to resolve at the time plaintiff declined to present a case. Plaintiff's conduct effectively invited the trial court to enter an adverse judgment.

In *Globe,* while further hearings in the case were pending, the plaintiff and the defendant entered into a consent judgment. *Id.,* 322 Md. at 715, 589 A.2d 956. The defendant then sought to appeal the trial court's earlier non-final order in which it entered partial summary judgment in favor of the plaintiff. The Court of Appeals held that the appeal had to be dismissed because a party may not ordinarily obtain review of an adverse ruling in a case where it subsequently consented to judgment. *Id.,* 322 Md. at 717, 589 A.2d 956.

In *Emersonian Apartments,* the trial court overruled the defendant's demurrer to the plaintiff's complaint. *Id.,* 132 Md. at 210, 103 A. 423. Under the practice at that time, the overruling of a demurrer was not a final judgment, and the defendants were required to file an answer to the complaint within a specified time. When the defendants refused to file an answer, the court proceeded to enter judgment in favor of the plaintiff. *Id.* The defendants then appealed. The Court dismissed the appeal, because the defendants had consented to the adverse judgment for the purpose of evading the doctrine that barred an appeal from the overruling of a demurrer. *Id.,* 132 Md. at 213–14, 103 A. 423. As with the previous cases, there were, at the relevant time, substantive issues left to be

resolved in the lower court proceedings; the judgment was not entered merely to correct a prior procedural oversight.

We find the case of *Waller v. Maryland National Bank*, 332 Md. 375, 631 A.2d 447 (1993) pertinent here. In *Waller*, the Court faced a situation in which a clerical error by the clerk of the circuit court prevented a judgment from being final. Although the error required dismissal of the appeal, the Court went on to state that the problem had "a reasonable solution"; the circuit court could correct the clerical error, and the appeal could then proceed on the same briefs and record. *Id.* at 380, 631 A.2d 447. It seems manifest that the request for an order to correct a clerical error does not constitute "acquiescing" to a final judgment within the ambit of the doctrine that one may not consent to a judgment and then appeal from it.

In the present case, it is equally apparent that the conduct of Scott and General Accident in securing a remand was solely to correct a procedural defect in the case that prevented the judgment from being final; they did not waive their right to appeal by acquiescing in a final judgment. Nor were there substantive issues pertaining to Hartford left to resolve after the circuit court's ruling of March 11, 1994.

■ We consider next the merits of the claim. As we have noted, Md.Ann.Code, art. 48A, § 541(c)(2) (Supp.1995), requires that all motor vehicle liability insurance policies contain uninsured motorist coverage. Section 541(c)(3) sets forth an uninsured motorist carrier's maximum liability to its insured based on this required insurance. As it read at the time of Scott's accident, § 541(c)(3) provided: "The limit of liability for an insurer providing uninsured motorist coverage under this subsection is the amount of that coverage less the sum of the limits under the liability insurance policies, bonds, and securities applicable to the bodily injury or death of the insured." [6]

---

**6.** In 1995, the General Assembly amended § 541(c)(3), so that it now provides:

We are faced with two questions regarding this statute: (1) whether the insurer's maximum liability is calculated simply by comparing the limits of the pertinent policies, without any allowance for what the insured actually collects from the tortfeasor's liability insurer; and (2) where a policy contains more than one limit, such as per person and per occurrence, *which* limit should be employed in this calculation.

As for the first issue, we conclude that the terms of the earlier version of § 541(c)(3) provided for a strict limit-to-limit comparison, without regard to the amount that the injured party actually *receives* from the tortfeasor's insurance carrier. Thus Hartford's maximum liability to Scott is the difference between the applicable coverage limit of the Hartford uninsured motorist insurance policy and the applicable coverage limit of the liability insurance policy. We base our view on cases construing § 541(c)(3), which have employed a plain meaning interpretation.

In *Fireman's Fund Insurance Co. v. Bragg*, 76 Md.App. 709, 548 A.2d 151 (1988), the insured, who was covered by an uninsured motorist insurance policy with a coverage limit of $50,000, was injured by a tortfeasor insured by a liability insurance policy that also had a coverage limit of $50,000. Viewing § 541(c)(3) as unambiguous, we held that the insured could not collect under the uninsured motorist policy, because the insurer's maximum liability under the terms of the statute was the difference between the coverage limit of the uninsured motorist insurance policy and the coverage limit of the tortfeasor's insurance policy, and that difference equalled zero. *Id.*, 76 Md.App. at 715–16, 548 A.2d 151.

---

The limit of liability for an insurer providing uninsured motorist coverage under this subsection is the amount of that coverage less the *amount paid to the insured that exhausts* any applicable liability insurance policies, bonds, and securities on behalf of any person who may be held liable for the bodily injuries or death of the insured. (Emphasis supplied). The amended version applies only to causes of action accruing on or after October 1, 1995, Acts 1995, ch. 515, § 2, which is obviously long after Scott's accident.

The case of *Nationwide Mutual Insurance Co. v. Wendler,* 796 F.Supp. 201 (D.Md.1992), which construed the earlier version of § 541(c)(3), is also instructive here. It makes clear that, under the earlier law, the amount collected by the insured from the tortfeasor is not relevant in determining the uninsured carrier's obligation. There, the named insured, Andrew Wendler, was driving an automobile covered by an uninsured motorist insurance policy with a coverage limit of $50,000 per person and $100,000 per accident. Rose Kownacki, who was then seven months pregnant, and her husband, Lawrence, were passengers in the car. The car was struck by a tortfeasor driving a vehicle insured by a liability insurance policy with a coverage limit of $300,000 per accident. Both Rose Kownacki and her baby daughter, Abigail, who was delivered by Caesarean section, died. The tortfeasor's insurer paid $100,000 each to the estates of Rose and Abigail Kownacki, $10,000 to Lawrence Kownacki, and $42,500 to Wendler. Lawrence Kownacki and Wendler then made a claim against Wendler's uninsured motorist policy, contending that the tortfeasor was underinsured because they had *collected* from the liability insurer less than the coverage limit of the uninsured policy.

The court rejected their claim. Following our decision in *Fireman's Fund Insurance Co. v. Bragg, supra,* the court concluded, "Both the policy and the statute are straightforward and by their terms only require a comparison of the applicable coverage limits to determine if a motorist is underinsured." *Wendler,* 796 F.Supp. at 204. The court therefore made a simple comparison of the policy limits of the tortfeasor's policy and the uninsured motorist insurance policy and held that the tortfeasor was not underinsured, because her policy limit exceeded the limits of the uninsured motorist insurance policy. 796 F.Supp. at 203–05.

We recognize that in *Aetna Casualty & Surety Co. v. Souras,* 78 Md.App. 71, 552 A.2d 908 (1989), we stated that the insured was entitled to recover under his uninsured motorist insurance policy the difference between the $50,000 coverage limit of the policy and "the $25,000 *received* from the tortfea-

sor's insurer." *Id.* at 78, 552 A.2d 908 (emphasis supplied). But in *Souras,* the $25,000 that the insured received was equal to the coverage limit of the tortfeasor's policy. The *Souras* Court did not state, as a general rule, that what an insured receives from a tortfeasor's insurer is to be used in determining whether the tortfeasor's vehicle is uninsured under the pre-October 1, 1995 version of § 541(c)(3). *Souras*'s reference to what is "received" cannot contradict the plain terms of the statute that mandated a strict limit-to-limit comparison.

We turn, then, to a comparison of the policy limits, and address our second issue. The Hartford uninsured policy had a single coverage limit of $50,000, i.e., $50,000 per person and $50,000 per occurrence. Watson's State Farm policy, the "applicable" liability insurance policy, had two limits: a "per person" limit of $25,000 and a "per occurrence" limit of $50,000. The question, then, is: Which of the State Farm limits should be compared with Hartford's limit? General Accident contends that we should use State Farm's "per person" limit of $25,000 in the comparison, while Hartford contends that the occurrence limit of $50,000 applies to the facts of this case. We agree with Hartford. We find support for our view in two recent decisions of the Court of Appeals: *Waters v. United States Fidelity & Guaranty Co.*, 328 Md. 700, 616 A.2d 884 (1992), and *Erie Insurance Co. v. Thompson,* 330 Md. 530, 625 A.2d 322 (1993).

*Waters* involved an accident in which two people were injured. One injured party, Waters, was covered by an uninsured motorist policy with coverage limits of $100,000 per person and $300,000 per accident. The tortfeasor was covered by a liability policy with per person and per accident limits both in the amount of $100,000. The Court held that Waters could collect under his uninsured motorist policy. It reached this conclusion by comparing the *per accident* limits of the policies involved. It did so because, as the Court stated, "Two persons were injured in this accident, and thus the per accident limitation is critical." 328 Md. at 714, 616 A.2d 884. As the per accident limit of Waters's uninsured motorist insur-

ance policy ($300,000) was more than the per accident limit of the tortfeasor's liability insurance policy ($100,000), the tortfeasor was deemed underinsured.

The *Thompson* case is strikingly similar to the case at bar. *Thompson* arose out of an automobile accident involving multiple victims. Thompson was injured when the car in which she was a passenger was struck by a tortfeasor insured by a liability policy with coverage limits of $20,000 per person and $40,000 per accident. The driver of the car in which Thompson was riding was also injured and two other occupants of the car were killed. The Thompson vehicle was covered by an uninsured motorist policy with a single coverage limit of $100,000. Thompson also owned an uninsured motorist policy with limits of $100,000 per person and $300,000 per accident. Following *Waters*'s admonition that the "per accident" limits are what are relevant when more than one person is injured by a tortfeasor, the Court analyzed the question of whether the tortfeasor was underinsured for purposes of Thompson's uninsured policy and it compared the per accident limits of the policies involved. As the per accident limit of Thompson's policy ($300,000) was greater than the sum of the per accident limits of the other policies providing coverage for the accident ($40,000 for the tortfeasor's policy and $100,000 for the uninsured motorist policy for the car in which Thompson was riding), the Court held that Thompson was entitled to make a claim under her own policy.

We now apply the principles of these cases. *More than one person was injured* in the accident at issue in this case. Therefore, it is the State Farm per occurrence limit of $50,000 that is relevant; the per person limit of $25,000 would be applicable if Scott were the only person that Bain injured. In comparing the State Farm per occurrence limit with the Hartford uninsured policy limit of $50,000, it is apparent that Hartford is not obligated to pay; its $50,000 single limit does not constitute greater coverage than State Farm's $50,000 per occurrence limit. As the difference between the policy limits is zero, the "limit" of Hartford's obligation to Scott under

§ 541(c)(3) is likewise zero. The circuit court was thus correct in holding that Hartford has no obligation to Scott.

In this Court, General Accident argues that *the terms of the Hartford policy,* irrespective of § 541(c)(3), entitle Scott to coverage. General Accident did not present this argument to the circuit court. Therefore, we decline to consider it here. *See* Md.Rule 8–131(a).

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**