REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2598

SEPTEMBER TERM, 2014

_____

THE FUND FOR ANIMALS, INC.

v.

NATIONAL UNION FIRE INSURANCE
COMPANY OF PITTSBURGH, PA.

_____

Eyler, Deborah S.,
Meredith,
Wilner, Alan M. (Retired,
          Specially Assigned),

JJ.

_____

Opinion by Eyler, Deborah S., J.

_____

Filed: February 1, 2016

In Maryland, an insurer on a liability insurance policy may disclaim coverage on the ground that the insured breached the policy by giving late notice of a claim "only if the insurer establishes by a preponderance of the evidence that the . . . [late] notice has resulted in actual prejudice to the insurer." Md. Code (1997, 2011 Repl. Vol.), § 19-110 of the Insurance Article ("Ins."). In this case, we hold that when an insured gives late notice and during the period of delay in notification the insured's defense becomes impaired, to the actual prejudice of the insurer, the insurer may disclaim coverage only if there is a causal link between the late notice and the prejudice.

The Fund for Animals, Inc. ("the FFA"), the appellant, was an insured on a liability policy issued by National Union Fire Insurance Company of Pittsburgh, Pa. ("National Union"), the appellee. National Union disclaimed coverage on a claim against the FFA on the ground that the FFA gave it late notice. In the Circuit Court for Montgomery County, the FFA sued National Union for breach of the insurance policy. At the close of all the evidence in a jury trial, the circuit court granted National Union's motion for judgment, ruling that the evidence established as a matter of law that the FFA's late notice of the claim had caused actual prejudice to National Union, and therefore it properly disclaimed coverage. We shall reverse the judgment and remand the case for further proceedings not inconsistent with this opinion.

### FACTS AND PROCEEDINGS

The FFA, a national non-profit organization headquartered in Gaithersburg, is dedicated to the protection of animals. Since 2005, it has been an affiliate of the Humane Society of the United States ("HSUS"). It operates animal sanctuaries and wildlife

centers around the country and engages in lobbying and advocacy, including litigation, to advance its goals.

National Union issued a "Not-For-Profit Individual and Organization Insurance Policy" to HSUS that was in effect between January 1, 2007, and June 8, 2008 ("the 2007 Policy"). The FFA is an "Additional Insured" on the policy. As relevant, Coverage C provides:

> This policy shall pay on behalf of the Organization [here, the FFA] Loss arising from a Claim first made against the Organization during the Policy Period . . . and reported to the Insurer pursuant to the terms of this policy for any actual or alleged Wrongful Act of the Organization. The Insurer shall, in accordance with and subject to Clause 8, advance Defense Costs of such Claim prior to its final disposition.

This language establishes that the 2007 Policy is a claims-made-and-reported-policy, which means that it will cover a claim (otherwise covered by the policy) made against the insured and reported to the insurer during the policy period. The relevant policy language defines a "Claim" to mean "a written demand for monetary relief" or "a civil . . . proceeding for monetary . . . relief which is commenced by . . . service of a complaint or similar pleading." ¶ 2.(b)(1)&(2). The "Notice/Claim Reporting Provisions" section of the policy states that "the Insureds shall, as a condition precedent to the obligations of the Insurer under this policy, give written notice to the Insurer of any Claim made against an Insured as soon as practicable [or at] anytime during the Policy Year." ¶ 7.(a). "A Claim shall be considered to have been first made against an Insured when written notice of such Claim is received by any insured . . . ." ¶ 7.

2

In the 2007 Policy, National Union assumes a duty to pay defense costs for any covered claim, but does not assume a duty to defend unless the insured tenders a Claim to it within thirty days of the claim being made. ¶¶ 1 & 8. Even if a claim is not tendered, National Union maintains the right to "effectively associate with the Insureds in the defense of any Claim that appears reasonably likely to involve [National Union], including but not limited to negotiating a settlement." ¶ 8.

Three lawsuits are in play in this coverage dispute: the Endangered Species Act case ("ESA Case"); the Racketeer Influence and Corrupt Organizations Act case ("RICO Case"); and the "Coverage Case." The FFA was a plaintiff in the ESA Case. It, other organizational plaintiffs, and one individual plaintiff[1] sued Feld Entertainment, Inc. ("Feld"), the owner of Ringling Brothers and Barnum & Bailey Circus ("Ringling Brothers"), and Ringling Brothers.[2] While the ESA Case was pending, Feld brought the RICO Case against the FFA and the other organizational plaintiffs in the ESA Case, alleging that they were bribing the individual plaintiff to testify falsely and were committing other criminal acts in prosecuting the ESA Case, for the purpose of establishing standing to sue. In the RICO Case, Feld sought to recover as damages the attorneys' fees and costs it was incurring in defending the ESA Case.

---

[1] As originally filed, there were three other individual plaintiffs, two employees of an organizational plaintiff and one former employee of Feld. These individual plaintiffs withdrew within the first year of the litigation.

[2] Except as otherwise necessary we shall refer to Feld and Ringling Brothers as "Feld."

It is undisputed that the FFA did not give National Union notice of the RICO Case for more than two years after it was filed. By then, the court in the ESA Case had granted judgment in favor of Feld, on the ground that the ESA plaintiffs lacked standing. That ruling was based on numerous detailed factual findings, including that the FFA and the organizational plaintiffs had paid the individual plaintiff for testimony that was false. National Union denied coverage to the FFA based on late notice. In the Coverage Case brought against it by the FFA, National Union took the position that it suffered actual prejudice due to the late notice because, as a defendant in the RICO Case, the FFA would be precluded from contesting many of the essential facts found by the court in the ESA Case, and those facts undermined any defense the FFA would have.

1. **The ESA Case**

In 2000, in the United States District Court for the District of Columbia, the FFA, the American Society for the Prevention of Animal Cruelty ("ASPCA"), the Animal Welfare Institute ("AWI"), and Thomas Rider sued Feld for declaratory and injunctive relief, upon allegations that Ringling Brothers' mistreatment of Asian elephants in its circus violated the Endangered Species Act, 16 U.S.C. § 1531, *et seq*.

The ESA Case was brought under the citizen-suit provision of the ESA, which eliminates judicially imposed limits on the exercise of federal jurisdiction, known as "prudential standing." *See Bennett v. Spear*, 520 U.S. 154, 164 (1997). There still must be standing under the "case or controversy" provision of Article III of the United States Constitution, however. *Id*. Thus, at least one plaintiff must show that he or she

4

(1) . . . suffered an "injury in fact"—an invasion of a judicially cognizable interest which is (a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical; (2) that there [is] a causal connection between the injury and the conduct complained of—the injury must be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court; and (3) that it [is] likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

*Id*. (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–561(1992)).

In the operative complaint in the ESA Case, Rider alleged that he had worked for Ringling Brothers for two years as a barn man, cleaning up after the elephants; that, during that time, he had grown emotionally attached to some of the elephants, who he called "his girls"; that he had witnessed their mistreatment with bull hooks at the hands of other Ringling Brothers' employees; and that he wished to "visit" the elephants again and "enjoy observing them," but he could not do so because he feared he would witness their scars and behavioral tics, which are manifestations of abuse, and would experience emotional distress.

The ESA Case was assigned to Judge Emmet G. Sullivan. In 2001, Judge Sullivan granted a motion to dismiss for lack of Article III standing. In particular, Judge Sullivan ruled that the facts alleged in the operative complaint were legally insufficient to support a finding that Rider had suffered a cognizable and redressable injury; and, with the exception of one organizational plaintiff (not the FFA), the organizational plaintiffs only could demonstrate standing through Rider.

The FFA, the other organizational plaintiffs, and Rider appealed, and on February 4, 2003, the United States Court of Appeals for the District of Columbia reversed.

5

*ASPCA v. Ringling Bros. and Barnum & Bailey Circus*, 317 F.3d 334 (D.C. Cir. 2003). The court held that the operative complaint alleged facts sufficient to show that, because of Rider's personal, emotional attachment to the elephants, the alleged ESA violations had caused him to suffer a cognizable injury that differed in kind from any injury experienced by members of the public at large and that amounted to more than a generalized interest in the enforcement of the law; and Rider's injury was redressable because, were Ringling Brothers to be enjoined from using the elephant training techniques the organizational plaintiffs were alleging to be abusive, Rider could visit the elephants he once tended to without suffering emotionally, or fearing that he would.

On remand to the district court, the FFA and the other plaintiffs filed a new lawsuit making the same allegations against Feld and Ringling Brothers and dismissed their original action without prejudice.[3]  (We continue to refer to this litigation as the ESA Case.)  The Animal Protection Institute ("API") later joined as a plaintiff.

In February of 2007, Feld filed a motion for leave to amend its answer and to file a counterclaim against the ESA plaintiffs based on violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 *et seq*., and the Virginia Conspiracy Act, Va. Code Ann. § 18.2–499.  Judge Sullivan denied the motion on the ground that it was filed for dilatory purposes and would prejudice the plaintiffs.  *ASPCA v. Ringling Bros. and Barnum & Bailey Circus*, 244 F.R.D. 49, 52 (D.D.C. 2007).  As we

---

[3] It is not apparent from the record why they did so.

shall discuss, a few months later, on August 28, 2007, Feld filed the RICO Case as a separate action against the FFA and the other ESA organizational plaintiffs.

After protracted discovery, the ESA Case was tried non-jury for six weeks in February and March of 2009. Rider testified about the mistreatment of the elephants and the emotional trauma he suffered as a consequence.

In December of 2009, the court issued a lengthy memorandum opinion and order and entered judgment in favor of Feld. The court concluded that neither Rider nor any of the organizational plaintiffs had established Article III standing. *Am. Society for the Prevention of Cruelty to Animals v. Feld Entertainment, Inc.*, 677 F.Supp.2d 55, 91, 97-98 (D.D.C. 2009). The court made 85 findings of fact relative to standing. It rejected Rider's testimony in its entirety, concluding that he was "essentially a paid plaintiff and fact witness who is not credible." *Id.* at 67.

The following are among the findings pertinent to the court's standing decision. From March of 2000 forward, Rider's sole source of income was money paid to him by the organizational plaintiffs, including the FFA, and by animal rights organizations sympathetic to them. These payments were made directly to him by Meyer, Glitzenstein & Crystal ("MGC"), the law firm representing the plaintiffs in the ESA Case, and indirectly to him by "grants" from the Wildlife Advocacy Project ("WAP"), a non-profit organization run by two of the named partners in MGC. The FFA paid Rider $4,400 through MGC and $1,000 directly; and, in addition, the FFA and HSUS together paid Rider $11,500 through WAP. Although these payments supposedly were compensation for media outreach by Rider in connection with the litigation, in reality, they were used to

7

cover Rider's basic living expenses. Moreover, the "primary purpose" of the payments was "to keep[] Rider involved with the litigation[] because he [was] the only plaintiff who allege[d] a personal and emotional attachment to the elephants and an aesthetic injury based on the alleged mistreatment he claims to have witnessed." *Id*. at 79. The FFA and the other organizational plaintiffs had to have known that the payments were improper; and they were "less than forthcoming about the extent of the payments" made to Rider, even when specifically asked about those payments in discovery. *Id.* at 82.

Having found that none of the plaintiffs in the ESA Case had standing, the court ruled that it lacked jurisdiction and declined to reach the merits of whether Feld had violated the ESA in its treatment of the Asian elephants. On appeal from the judgment entered in favor of Feld, the D.C. Circuit affirmed, holding, as relevant here, that the district court's findings that Rider did not have a personal attachment to the elephants he handled during his employment with Feld were not clearly erroneous and that the district court correctly ruled that, absent such a personal attachment, Rider did not suffer an emotional injury sufficient to give rise to Article III standing. *See Am. Society for Prevention of Cruelty to Animals v. Feld*, 659 F.3d 13 (D.C. Cir. 2011).[4]

---

[4] There is language in Judge Sullivan's opinion and in the D.C. Circuit's opinion to the effect that, during the trial in the ESA Case but before judgment was entered, all the organizational plaintiffs except API dismissed their claims. The claims were not dismissed. Rather, those organizational plaintiffs (including the FFA) abandoned their arguments that they had standing independent of Rider, as opposed to through Rider. Only API continued to maintain that it had independent Article III standing.

8

On April 10, 2012, Feld filed a motion for prevailing party attorneys' fees, under a fee-shifting provision of the ESA. *See* 16 U.S.C. § 1540(g)(4). On March 29, 2013, Judge Sullivan granted the motion, finding that the ESA Case was meritless, frivolous, and vexatious. He directed the parties to submit recommendations for further proceedings to determine the amount of attorneys' fees Feld had incurred.

## 2. The RICO Case

As noted, on August 28, 2007, Feld filed the RICO Case, naming the organizational plaintiffs in the ESA Case as defendants. Like the ESA Case, the RICO Case was brought in the United States District Court for the District of Columbia and was assigned to Judge Sullivan. The FFA was served with the complaint on September 6, 2007.

Feld alleged that the ESA organizational plaintiffs had engaged, and were continuing to engage, in illegal conduct in their prosecution of the ESA Case, including by paying Rider over $100,000 to testify, falsely, that he had suffered an emotional injury as a result of the alleged mistreatment of the Asian elephants and by attempting to conceal those payments from Feld. Feld claimed that these acts constituted bribery under state and federal law, illegal witness payments, obstruction of justice, and mail and wire fraud, which were violations of RICO; a conspiracy to violate RICO; and violations of the Virginia Conspiracy Act. It sought to recover as damages its "ongoing" attorneys' fees and costs in defending the ESA Case.

The FFA did not give National Union notice (in writing or otherwise) of the RICO Case when it was served with the complaint, or any time during the policy period for the July 2007 Policy, *i.e.*, before June 8, 2008.[5]

Almost immediately upon being served, the defendants in the RICO Case, including the FFA, moved for a stay, which Feld opposed. By order of November 7, 2007, Judge Sullivan granted the motion and the RICO Case was stayed pending the resolution of the ESA Case. In entering the stay, Judge Sullivan noted that the RICO Case was predicated upon the ESA Case and that the damages Feld was seeking to recover in the RICO Case were the attorneys' fees and costs it had incurred and was continuing to incur in the ESA Case.

On January 15, 2010, about a month after entering judgment in favor of Feld in the ESA Case, Judge Sullivan lifted the stay in the RICO Case. On February 16, 2010, Feld filed an amended complaint in the RICO Case, adding HSUS, two HSUS employees, MGC, and six lawyers employed by MGC as defendants, and also adding common law claims for abuse of process, malicious prosecution, maintenance, and champerty. Feld's core allegation was that the ESA organizational plaintiffs and their attorneys had conspired to bribe Rider to lie about his attachment to the elephants in order to give the

---

[5] As mentioned above, in February of 2007, Feld sought to file as a counterclaim in the ESA Case the claims he later filed separately, in the RICO Case, in August of 2007. In oral argument before this Court, counsel for National Union asserted that, under the 2007 Policy, the FFA's duty to give it notice of the RICO claims arose in February of 2007. Assuming this is correct, it makes no difference in our analysis.

10

ESA organizational plaintiffs standing to pursue, by litigation, their campaign to bring a halt to Ringling Brothers' use of Asian elephants in its circuses.

On March 1, 2010, Roger Kindler, general counsel for HSUS and its affiliates, including the FFA, gave its insurance broker, BB&T Insurance Services, Inc. ("BB&T"), written notice of Feld's amended complaint in the RICO Case. In his letter, Kindler stated that HSUS and its affiliates were demanding coverage under the National Union Policy for the 2010 term year ("the 2010 Policy"), which was substantially the same as the 2007 Policy. (The FFA was an "Additional Insured" on the 2010 Policy as well). BB&T forwarded a copy of the amended complaint to National Union.

In response, a claims adjuster for Chartis, National Union's claims administrator, requested a copy of the original complaint in the RICO Case. By letter dated May 10, 2010, Kindler forwarded a copy of the original complaint to Chartis. He noted that the RICO Case had been "promptly stayed by the [district] court pending the outcome of the [ESA Case]." He further advised that the district court had scheduled mediation "of both these cases" for June 8 and June 24, 2010.

By letter of May 26, 2010, Chartis, on behalf of National Union, informed HSUS and the FFA that National Union was disclaiming coverage for both of them in the RICO Case under the 2010 Policy and under the 2007 Policy because the claim was made against the FFA in 2007, and notice of the claim was not given during the 2007 Policy term. The letter included a general reservation of rights.

On June 16, 2010, Kindler e-mailed Chartis to contest its coverage decision. He again advised that there was "on-going, formal mediation in the District of Columbia

11

involving all parties[] that ha[d] the potential of resolving the nest of claims between Feld . . . and the charities and individuals named in the Amended RICO Complaint." He went on to state that "[i]f the mediation fails, the parties and their insurance carriers are looking forward to, it is safe to say, years of intense litigation and the associated costs."

Neither National Union nor Chartis responded to that e-mail. Indeed, from the time coverage was disclaimed, neither one had any involvement whatsoever in the RICO Case. The FFA hired counsel, participated in mediation, moved to dismiss the amended complaint, pursued (unsuccessfully) an interlocutory appeal from the denial of that motion, and engaged in discovery for over six months.[6]

As discussed, in March of 2013, Judge Sullivan granted Feld's motion for prevailing party attorneys' fees in the ESA Case and directed the parties to submit recommendations for further proceedings to determine the amount of the fees incurred by Feld. Almost a year later, in February of 2014, the FFA, the other defendants in the RICO Case, and Feld engaged in settlement negotiations. In May of 2014, a settlement was reached in the RICO Case in which Feld would be paid $15.75 million in exchange for dismissing, with prejudice, that case and the pending attorneys' fees claim in the ESA Case. Under the terms of the settlement agreement, the FFA and HSUS were responsible

---

[6] For about a year, the FFA was represented *pro bono* in the RICO Case by Clifford Chance, an international law firm with offices in D.C. Ropes & Gray, also an international law firm, represented all of the organizational defendants on a *pro bono* basis during the mediation. When the mediation failed, Clifford Chance and Ropes & Gray withdrew from the case. Thereafter, the FFA hired the Zuckerman Spaeder law firm to defend it.

for $10.675 million of the $15.75 million settlement amount. After accounting for other insurance, HSUS's share, and a claw back provision in an agreement with another insurer, the FFA's share of the settlement payment was $2.536 million.

3. **The Coverage Case**.

In the meantime, on September 6, 2012, while the RICO Case was pending and before Judge Sullivan ruled on Feld's motion for prevailing party attorneys' fees in the ESA Case, the FFA filed the Coverage Case against National Union (from which this appeal stems), in the Circuit Court for Montgomery County. It alleged that National Union breached the 2007 Policy by disclaiming coverage in the RICO Case based on late notice.[7]

Initially, National Union took the position that Virginia law applied, under which the late notice alone was sufficient to support its disclaimer of coverage. It moved for summary judgment on that ground. On December 1, 2014, the court denied National Union's motion, ruling that Maryland law, not Virginia law, applied, and under Ins. section 19-110, to effectively disclaim coverage based on the FFA's late notice of the RICO Case, National Union had to prove, by a preponderance of the evidence, that it had

---

[7] The FFA also claimed that National Union breached the 2010 Policy. The court granted summary judgment to National Union on that claim, ruling that the 2010 Policy did not apply, and therefore it could not have been breached. That ruling is not challenged on appeal.

13

suffered actual prejudice due to the late notice.[8]  The court further ruled that, because National Union did not present any evidence in support of its motion to show that, "had [it] been given earlier notice, it would have joined the ESA trial team and changed the result of that case," there was a genuine dispute of material fact on the issue of actual prejudice.[9]

From January 12 through 15, 2015, the Coverage Case was tried before a jury. The FFA called four witnesses: Michael Markarian, its president; George Wade, the CFO of HSUS; Kindler; and Roger Zuckerman, a partner at the Zuckerman Spaeder law firm. Markarian testified that the FFA did not give National Union notice of the RICO Case in 2007, when it was filed, because it viewed the case as an "intimidation tactic," not as a "serious threat," and because the case was stayed almost immediately after it was filed.

Kindler testified concerning the notice to National Union, through Chartis, and his email to Chartis after it issued its declination of coverage letter.  He stated that he had discussions with Markarian and MGC in 2007, when the RICO Case first was filed, and it had been the "consensus" view at that time that Feld had filed the case merely as a "litigation tactic" in its defense of the ESA Case, not as a "substantive suit."

_____

[8] On appeal, National Union does not contest the court's choice of law ruling or the application of Ins. section 19-110 to its disclaimer of coverage.

[9] On December 19, 2014, National Union moved for reconsideration of the denial of summary judgment with respect to the claim for breach of the 2007 Policy.  Its motion for reconsideration was denied by order of January 8, 2015.

14

Zuckerman recounted the strategic decisions made by lawyers with his firm in defending the FFA in the RICO Case and in settling the case. He opined that the FFA had a reasonable chance of prevailing in a trial in the RICO Case, but the potential damages in the event of a defeat were too enormous to justify the risk of going to trial. In his view, "the ESA [C]ase . . . had virtually no impact on the settlement decision in the RICO case." He testified that the FFA was seeking to recover its $2.536 million share of the settlement payment and the costs of defense it had incurred. Zuckerman further testified that he and other lawyers at his firm devoted a significant amount of time to researching the issue of collateral estoppel and ultimately concluded that the doctrine would not operate to preclude the FFA from litigating "from scratch" the facts decided against it in the ESA Case.

At the close of the FFA's case, National Union moved for judgment, arguing that the evidence adduced by the FFA proved that it (National Union) had suffered actual prejudice as a matter of law and also that the FFA had failed to prove its damages with reasonable certainty. The court reserved on the motion.

National Union called Maureen Conboy as its sole witness. At the time of trial she was an assistant vice president with AIG Claims, Inc., formerly Chartis, a position she had occupied for two years. In that capacity, she supervised litigation. Before then, she had worked in the claims unit, adjusting claims on behalf of insureds, primarily under directors and officers liability policies. If a claim were deemed to be covered, she would supervise and assist the insured in defending it by hiring panel counsel and paying defense costs, managing the litigation, and attending mediation.

On direct examination, Conboy testified that because National Union was given late notice of the RICO Case it was deprived of an opportunity to

> participate in the decision to stay the [RICO Case,] . . . monitor the ESA [Case] and to try to settle the stayed [RICO Case] before Judge Sullivan made his findings in December of 2009 and before Feld incurred another 11 million or so dollars in fees in the ESA [Case] during that period when we d[idn't] know anything about this.

She stated that, had notice been timely given, panel counsel assigned by National Union to represent the FFA as a defendant in the RICO Case could have collaborated with the lawyers representing the FFA as a plaintiff in the ESA Case. On cross-examination, when asked to elaborate, she acknowledged that National Union could not have appointed counsel to represent the FFA in the ESA Case. It could have had panel counsel enter an appearance in the RICO Case and would have "monitored" the ESA Case.

At the close of all the evidence, National Union renewed its motion for judgment.[10] It argued that the principle that a liability insurer suffers actual prejudice as a matter of law when it is not given notice of a claim until "after a verdict or judgment comes in" on the claim applied, because it was not given notice of the RICO Case until after judgment was entered in the ESA Case. It maintained that it made no difference that the judgment in question was entered in the ESA Case, not in the RICO Case, because 1) the damages Feld was seeking in the RICO Case were the fees it had incurred

---

[10] It made its motion orally and in writing. It attached to the written motion a chart detailing Judge Sullivan's relevant findings of fact and conclusions of law in the ESA Case and matched them up to the related allegations in the amended complaint in the RICO Case.

16

in defending the ESA Case, and 2) under the doctrine of collateral estoppel, Judge Sullivan's factual findings in the ESA Case were "preclusive" of the relitigation of "certain issues." Thus, according to National Union, the FFA's defense in the RICO Case was substantially impaired by the adverse factual findings made in the ESA Case.

The FFA responded that National Union waived its collateral estoppel argument by not raising it in its answer; and, in any event, collateral estoppel would not apply to Judge Sullivan's factual findings pertaining to the FFA in the ESA Case because they were not necessary to the judgment in that case. It argued, moreover, that, because Zuckerman had testified that his firm's decision to settle the RICO Case was not driven in any respect by concern about the preclusive effect of the findings in the ESA Case, it was a jury question whether the defense of the RICO Case was impaired by the judgment in the ESA Case.

Ruling from the bench, the court granted National Union's motion for judgment. The court stated that, to disclaim coverage based on the late notice, National Union needed to prove, by a preponderance of the evidence, that it suffered actual prejudice due to the "proceedings that occurred in the [ESA Case] during the period between [the filing of the RICO Case in 2007] and [the notification of the RICO Case in 2010]." As the court put it, National Union was required to prove that "the outcome of the trial [in the ESA Case]" caused it actual prejudice.

The court found that National Union had met that burden, as a matter of law, reasoning as follows. Judge Sullivan's findings of fact in the ESA Case were made after notice of the RICO Case should have been given by the FFA but was not. The factual

17

findings that "Rider's testimony was purchased by [the ESA plaintiffs, including the FFA]," that the FFA "lied in discovery, and/or at the very least concealed evidence of those payments," and that the FFA tried to "disguise the payments [to Rider] . . . as payments for media services" were "material and relevant to the [standing] issue before [Judge Sullivan in the ESA Case]" and were the basis for the judgment entered in the ESA Case; therefore, they were "finally determined" in the ESA Case. The FFA had had the opportunity to "fully litigate those issues" in the ESA Case. Accordingly, under the doctrine of collateral estoppel, in a trial in the RICO Case, the FFA would be precluded from contesting those same facts and would be bound by them. Those facts would be significantly detrimental to the FFA's defense in the RICO case. The court rejected the FFA's argument that collateral estoppel had been waived.

Alternatively, the court reasoned that, even if collateral estoppel would not apply in the RICO Case and Judge Sullivan's factual findings in the ESA Case would not be binding on the FFA in a trial of the RICO Case, the findings necessarily would create "a substantial problem in [the RICO Case] for [National Union] . . . in terms of evaluating the settlement of [the RICO Case]." In the court's view, Judge Sullivan's findings in the ESA Case would drive up the settlement value of the RICO Case, thereby prejudicing National Union, as a matter of law.

On March 12, 2015, the court entered judgment in favor of National Union. This timely appeal followed. FFA presents three questions for review, which we have combined and reworded:

18

I. Did the trial court err by ruling that National Union did not waive the affirmative defense of collateral estoppel?

II. Did the trial court err in applying the doctrine of collateral estoppel to rule that National Union suffered actual prejudice, within the meaning of Ins. Section 19-110, as a matter of law?[11]

## DISCUSSION

Ins. section 19-110 provides:

An insurer may disclaim coverage on a liability insurance policy on the ground that the insured or a person claiming the benefits of the policy through the insured has breached the policy by failing to cooperate with the insurer or by not giving the insurer required notice only if the insurer establishes by a preponderance of the evidence that the lack of cooperation or notice has resulted in actual prejudice to the insurer.

Thus, to effectively disclaim coverage on the ground that its insured breached the terms of the policy by giving late notice of a claim, a liability insurer must prove by a preponderance standard that the late notice caused it actual prejudice. If an "insured violates [a] notice provision [of the policy] without harming the interests of the insurer— *i.e.,* without prejudice—then there is no reason to deny coverage." *Prince George's*

[11] The questions as posed by the FFA are:

1. Whether the Circuit Court erred by holding that National Union did not waive the affirmative defense of collateral estoppel by failing to plead that affirmative defense in its answer or mention it during discovery.
2. Whether the Circuit Court erred in its application of the doctrine of collateral estoppel.
3. Whether the Circuit Court erred by holding that National Union suffered actual prejudice under Maryland Code, § 19-110 of the Insurance Article based on developments that did not result from the insured's late notice and where the insurer had made no actual efforts to investigate, defend, or settle the underlying litigation during the four years that followed notice.

19

*County v. Local Gov't Ins. Trust*, 388 Md. 162, 185 (2007). "The rule [established in Ins. section 19-110 and its predecessor] avoids the "'disproportionate' forfeiture that would result 'when [a] notice provision is enforced in the absence of prejudice,' in which case 'the insurer suffers no harm and the insured forfeits the premiums and loses coverage.'" *Morse v. Erie Ins. Exchange*, 217 Md. App. 1, 12-13 (2014) (quoting *Local Gov't Ins.*, 388 Md. at 187) (second alteration in *Morse*).

Proof of harm to the insurer resulting from the late notice is essential. "[P]ossible, theoretical, conjectural, or hypothetical prejudice is not enough to satisfy section 19-110; prejudice cannot be surmised or presumed from the mere fact of delay." *Oliff-Michael v. Mutual Benefit Ins. Co.*, 262 F.Supp.2d 602, 604 (D. Md. 2003); *see also Gen. Acc. Ins. Co. v. Scott*, 107 Md. App. 603, 615 (1996) ("insurer may not disclaim coverage on the basis of prejudice that is only possible, theoretical, conjectural, or hypothetical"). Rather, the insurer must prove by a preponderance of the evidence that it in fact was prejudiced by the "late-delivered notice in investigating, settling, or defending [the subject claim]." *Sherwood Brands, Inc. v. Great Am. Ins. Co.*, 418 Md. 300, 331 (2011). *See also*, *Allstate Ins. Co. v. State Farm Mut. Auto Ins., Co.*, 363 Md. 106, 127-28 (2001) (in determining whether insurer was prejudiced by insured's failure to cooperate, focus should be on whether the insured's conduct "has, or may reasonably have, precluded the insurer from establishing a legitimate jury issue of the insured's liability").

## I.

### Waiver of Defense of Collateral Estoppel

As noted, in opposing National Union's motion for judgment at the close of the evidence, the FFA argued that National Union had waived the defense of collateral estoppel by not raising it in its answer, as required by Rule 2-323(g)(4), and therefore could not rely on collateral estoppel to show actual prejudice. The court rejected that argument. The FFA contends that the court's waiver ruling was legally incorrect.

National Union responds that it was not required to plead collateral estoppel as an affirmative defense in the Coverage Case because it was not raising that defense to the claim against it for breach of the insurance contract. Its defense to the breach of contract claim was that it was actually prejudiced by the FFA's late notice of the RICO Case. One of its arguments in support was that, *in the RICO Case*, Feld would use the doctrine of collateral estoppel offensively, to preclude the FFA from contesting the adverse factual findings made by Judge Sullivan in the ESA Case, to the detriment of the FFA's defense, and therefore to its (National Union's) prejudice.

"The doctrine of collateral estoppel precludes a party from re-litigating a factual issue that was essential to a valid and final judgment against the same party in a prior action." *Shader v. Hampton Improvement Ass'n, Inc.*, 217 Md. App. 581, 605 (2014); *see also Van Beneden v. Al-Sanusi*, 12 F.Supp.3d 62, 69-70 (D.D.C. 2014). In the D.C. Circuit, where both the ESA action and the RICO action were being prosecuted, a three-part test must be satisfied for collateral estoppel to apply:

> (1) the issue being raised must have been contested by the parties and submitted for adjudication in the prior case, (2) the issue must have been actually and necessarily determined by a court of competent jurisdiction and (3) preclusion in the second case must not work a basic unfairness to the party bound by the first determination.

21

*Wash. Metro. Area Transit Auth. v. Local 2, Office and Professional Emp. Int'l Union,* 965 F.Supp.2d 12, 23 (D.D.C. 2013) (citing *Yamaha Corp. of Am. v. United States,* 961 F.2d 245, 254 (D.C.Cir. 1992)).

Procedurally, collateral estoppel "*as a defense to a claim*" is an affirmative defense that must be raised in a party's answer. Md. Rule 2-323(g)(4) (emphasis added). If not, the defense is waived. *See Campbell v. Lake Hallowell Homeowners Ass'n*, 157 Md. App. 504, 527 (2004) (failing to plead affirmative defense in answer or amended answer bars reliance on the defense).

We agree with National Union that the FFA's waiver argument lacks merit. National Union's defense to the breach of insurance contract claim was that it did not owe coverage to the FFA because the FFA breached the 2007 Policy by giving it late notice of the RICO Case, which caused it actual prejudice. The actual prejudice National Union claimed to have suffered was that, by the time it was given notice of the RICO Case, in 2010, Judge Sullivan already had made findings of fact detrimental to the FFA in the ESA Case and, in the RICO Case, Feld could use the doctrine of collateral estoppel offensively to preclude the FFA from contesting those factual findings. Thus, National Union was not defending the breach of insurance contract claim against it on the ground of collateral estoppel. It was arguing that Feld would use collateral estoppel in the RICO Case to the prejudice of the FFA's defense and therefore to its (National Union's) prejudice. National Union was not required to plead collateral estoppel as an affirmative

22

defense in its answer in the Coverage Case when it was not using the doctrine *as a defense* in that case.

## II.

### Actual Prejudice as a Matter of Law

The standard of review of the trial court's decision to grant National Union's motion for judgment at the close of all the evidence is *de novo*. *Demuth v. Strong*, 205 Md. App. 521, 547 (2012). We "assume[] the truth of all credible evidence on the issue, and all fairly deducible inferences therefrom in the light most favorable to the [nonmoving party]." *Tate v. Bd. of Educ. of Prince George's County*, 155 Md. App. 536, 544 (2004).

The FFA bore the burden to prove that the 2007 Policy afforded it coverage in the RICO Case. That fact was conceded by National Union for purposes of the Coverage Case.

In defense, National Union bore the burden to prove that the FFA breached the 2007 Policy by not giving it timely notice of the RICO Case (which was not disputed) and that the late notice resulted in actual prejudice to it. For National Union to be entitled to judgment in its favor as a matter of law on this defense, the evidence, viewed most favorably to the FFA, had to be such as to compel the conclusion that the late notice caused actual prejudice to National Union, *i.e.,* no reasonable jury could find otherwise. *Cf., Willis v. Ford*, 211 Md. App. 708, 716 (2013) (to obtain judgment as a matter of law on defense of contributory negligence, the defendant "was required to show that there was no evidence from which the jury could find" that the plaintiffs acted reasonably).

23

The FFA contends the trial court erred as a matter of law in ruling that the evidence at trial conclusively proved actual prejudice, as required by Ins. section 19-110. It argues that National Union failed to show that any prejudice to the FFA's defense in the RICO Case, due to the collateral estoppel effect of the judgment in the ESA Case, "resulted from [the FFA's] late notice" of the RICO Case. It points out that the uncontradicted evidence at trial was that the judgment in the ESA Case "had a negligible effect on [the FFA's] decision to settle the RICO Case." It also argues that any prejudice to its defense in the RICO Case based upon allegedly binding adverse findings made against it in the ESA Case was hypothetical, not actual.

National Union responds, as it argued below, that this case is no different from those holding that an insurer is actually prejudiced by the late notice of a claim, as a matter of law, when notice is not given until after judgment has been entered against the insured. *See Local Gov't Ins. Trust*, 388 Md. at 188-94 (insurance trust was actually prejudiced as a matter of law when county did not give it notice of a federal civil rights lawsuit against it and three employee police officers until ten days after a jury awarded the plaintiff more than $4 million in damages); *Washington v. Federal Kemper Ins. Co.*, 60 Md. App. 288, 296 (1984) (insurer was actually prejudiced as a matter of law when insured home construction business did not give it notice of contract and tort lawsuit against it until after the case was tried to a jury, the court entered a directed verdict against the insured on one count, and the jury found against it on two other counts).

The parties devote much of their arguments on appeal to whether, in prosecuting the RICO Case, Feld could invoke the doctrine of collateral estoppel to preclude the FFA

24

from contesting Judge Sullivan's factual findings against it in the ESA Case. We shall assume that Feld could do so. The factual findings Judge Sullivan made in the ESA Case, when given preclusive effect in the RICO Case, would be seriously detrimental to the FFA's defense. Thus, the *judgment in the ESA Case* resulted in actual prejudice to National Union. To disclaim coverage, however, National Union had to show that *the late notice* of the RICO Case resulted in actual prejudice to it. It only could do so upon proof that, had it been given timely notice of the RICO Case, in 2007 or early 2008, instead of untimely notice in 2010, it would have taken some action in that period of delay that would have averted that judgment.

National Union's only evidence of what it would have done had it been given timely notice of the RICO Case was Conboy's testimony that it would have 1) appointed its own panel counsel to defend the FFA in the RICO Case; 2) monitored the ESA Case; 3) participated in the decision to stay the RICO Case; and 4) "tr[ied] to settle" the RICO Case before Judge Sullivan made his factual findings in December 2009.

As Conboy acknowledged, if National Union had appointed panel counsel for the FFA in the RICO Case in 2007, the most that counsel could have done with respect to the ESA Case was to monitor it, *i.e.*, keep National Union "apprised of what was happening in the ESA Case so that [it] would . . . know if anything . . . potentially bad was going to happen that would affect the [RICO Case]." Panel counsel could not have controlled the prosecution of the ESA Case, however, regardless of the direction in which the case was headed. And, by August of 2007, that direction was well-established. Rider had been receiving the payments from the ESA organizational plaintiffs since 2001, and the ESA

25

organizational plaintiffs already had provided the discovery responses that Judge Sullivan later would deem incomplete and/or misleading. There was no evidence, let alone compelling and conclusive evidence, that appointing panel counsel to monitor the ESA Case in 2007 would have had any impact on the outcome of that case.

Likewise, there was no evidence that, had National Union appointed counsel for the FFA in the RICO Case in 2007, the case would not have been stayed and would have been adjudicated before the ESA Case. The allegations of wrongdoing in the RICO Case were premised on the conduct of the FFA and the other organizational plaintiffs in the ESA Case and the damages Feld was seeking were the fees it had incurred and was continuing to incur in the ESA Case. Regardless of who was representing the FFA in the RICO Case, it would have been evident to Judge Sullivan as the assigned judge in both cases that a decision in the RICO Case had to await the outcome of the ESA Case.

Nor was there evidence that the RICO Case would have settled, and for a sum less than it later settled for in 2014, had National Union been notified of the case in 2007, instead of in 2010. Feld would not have had any reason or motivation to settle the RICO Case while the ESA Case was pending.

The element of control by the insurer over the claim distinguishes this case from *Local Gov't Ins. Trust* and *Kemper*, which, as noted, National Union argues are analogous. In those cases, because the insured delayed notifying the liability insurer of the claim until the claim had gone to trial and a judgment had been entered against the insured, the insurer was "presented . . . with a *fait accompli.*" *Local Gov't Ins. Trust*, 388 Md. at 190. If notice had been timely, the insurer would have been able to exercise

26

control—by appointing counsel, investigating the claim, directing the defense, and perhaps settling the claim—all of which the insurance policy gave it the right to do. As the Court in *Local Gov't Ins. Trust* observed, when notice of an insured claim is not given by the insured until after the judgment is entered on the claim, the late notice has the effect of nullifying the insurer's contractual rights to "participate[] in trial preparation, propose[] trial strategies, and encourage[] settlement." *Id*. at 193. In *Local Gov't Ins. Trust* and *Kemper*, the late notice of claim after judgment was entered caused actual prejudice to the insurers because it eliminated their right to control the litigation against their insured and either resolve it before trial or employ a more effective trial strategy.

In this case, National Union did not insure any defendant in the ESA Case. It had no right, contractually or otherwise, to control any aspect of the litigation of that case. It did not lose any right to control once the judgment in the ESA Case was entered because it never had a right to control to begin with.

In short, proof of late notice by the FFA of the RICO Case and proof of actual prejudice to National Union in the defense of the RICO Case due to the outcome of the ESA Case were not sufficient for an effective disclaimer of coverage under Ins. section 19-110. Evidence of a causal link between the two was necessary, *i.e.,* National Union had to show that the *late notice resulted in the actual prejudice* to it. *See Gen. Accident Ins. Co., supra,* 107 Md. App. at 616 (insurer "failed to identify any specific, palpable instances to show how its ability to protect its interests was frustrated"). In the absence of evidence that there was something National Union could and would have done during the delayed notice period that, more likely than not, would have changed the outcome in

27

the ESA Case, the causal link could not be proven.[12]  Accordingly, the trial court erred by entering judgment in favor of National Union as a matter of law.[13]

> JUDGMENT OF THE CIRCUIT COURT FOR MONTGOMERY COUNTY VACATED. CASE REMANDED FOR FURTHER PROCEEDINGS NOT INCONSISTENT WITH THIS OPINION. COSTS TO BE PAID BY THE APPELLEE.

---

[12] Because the FFA satisfied its burden of proof on coverage, upon the failure of proof on National Union's late notice defense, the FFA was entitled to judgment in its favor as a matter of law on liablity.  If the FFA had moved for judgment, we would direct the circuit court to enter judgment in its favor on liability.  The FFA did not move for judgment, however.  If, on remand, the FFA moves for summary judgment on liability, the same result should obtain.  The adequacy of the evidence on damages is not before us on appeal and damages will need to be decided on remand.

[13] We note, moreover, that when the FFA gave its delayed notice to National Union, in March of 2010, the RICO Case was in its infancy, having been stayed for all but three months of the period of delay.  The case was not at issue, discovery had not been undertaken, dispositive motions had not been filed, and settlement discussions had not taken place.  National Union had not lost its contractual rights to investigate, defend, and settle the RICO Case.  It took no action to investigate, defend, and/or settle the case, however, instead "rest[ing] on the technical defense of lack of . . . noti[ce]." *Woodfin Equities Corp. v. Harford Mutual Ins. Co.*, 110 Md. App 616, 658 (1996), *aff'd in part & rev'd in part*, 344 Md. 339 (1997).